On this issue we hold for respondent.

*Decision will be entered under Rule 155.*

CARL E. KOCH AND PAULA KOCH; FREDERICK W. KOCH AND ROBIN E. KOCH, A.K.A., ROBIN E. PRUITT; WILLIAM A. BOMBERGER AND CAROLYN L. BOMBERGER; AND JOHN J. KOCH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9648–76.     Filed October 23, 1978.

*Michael D. Annis* and *Michel G. Emmanuel,* for the petitioners.

*Robert J. Shilliday, Jr.,* and *William D. Brackett,* for the respondent.

FEATHERSTON, *Judge:* In this case,[1] respondent determined deficiencies in petitioners' Federal income tax for the years 1972, 1973, and 1974, as follows:

| Petitioners | 1972 | 1973 | 1974 |
|---|---|---|---|
| Carl E. Koch and Paula Koch ....... | $24,601.09 | $248,222.50 | $417,808.50 |
| Frederick W. Koch and Robin E. Koch (a.k.a. Robin E. Pruitt) ....... | 0 | 147,067.02 | 0 |
| William A. Bomberger and Carolyn L. Bomberger ................ | 0 | 134,980.98 | 0 |
| John J. Koch ........................... | 0 | 137,849.71 | 0 |

Other issues having been settled, the issues which remain for decision are as follows:

(1) Whether petitioners' exchanges in 1973 and 1974 of fee interests in real estate for fee interests in real property subject to 99-year condominium leases are like kind exchanges within the meaning of section 1031(a).[2]

(2) In the alternative, if gain is recognized under section 1001(c), what is the fair market value of the properties received by petitioners in the contested exchanges during 1973 and 1974?

### FINDINGS OF FACT

At the time the petition was filed, Carl E. Koch and Paula Koch, husband and wife, were legal residents of Fort Lauderdale, Fla. They filed their joint Federal income tax returns for 1972, 1973, and 1974, with the Office of the Internal Revenue Service, Chamblee, Ga.

---

[1]Pursuant to Rule 61, Tax Court Rules of Practice and Procedure, petitioners filed a joint petition which was accepted by this Court since the tax liabilities here involved arise out of the same transactions and occurrences and involve common questions of law and fact.

[2]All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

At the time the petition was filed, Frederick W. Koch was a legal resident of Victoria, Australia. At the time of filing the petition, Robin E. Koch (a.k.a. Robin E. Pruitt) was a legal resident of Eureka Springs, Ark. The joint Federal income tax return filed by Frederick W. Koch and Robin E. Koch for 1973 was filed with the Office of the Internal Revenue Service, Austin, Tex.

At the time the petition was filed, William A. Bomberger and Carolyn L. Bomberger, husband and wife, were legal residents of Bloomfield Hills, Mich. They filed their joint Federal income tax return for 1973 with the Office of the Internal Revenue Service, Cincinnatti, Ohio.

At the time the petition was filed, John J. Koch was a legal resident of San Marcos, Tex. He filed his individual Federal income tax return for 1973 with the Office of the Internal Revenue Service, Austin Tex.

All of the above-named petitioners (hereinafter referred to collectively as petitioners) employed the cash receipts and disbursements method of accounting in reporting their income for the years in issue.

In 1973, the following petitioners each held a 20-percent interest in the Glen Oaks Golf Club partnership (sometimes hereinafter the partnership): Carl E. Koch, Paula Koch, John J. Koch, Frederick W. Koch, and Carolyn Bomberger. Prior to the transaction hereinafter described, the partnership was engaged in the business of operating an 18-hole golf course and a 2,777-square-foot clubhouse. The primary asset owned by the partnership was 29.7 acres of real estate improved with the golf club and located in Clearwater, Fla.

On February 14, 1973, the partners in the Glen Oaks Golf Club partnership (hereinafter the partners or Koch) and Imperial Land Corp. (hereinafter Imperial) entered into an agreement (hereinafter the 1973 agreement) whereby the partners agreed to convey the Glen Oaks Golf Club property, described in the 1973 agreement as "Parcel A," to Imperial in exchange for a conveyance by Imperial to the partners of certain property, designated and described in the 1973 agreement as "Parcel B."

Paragraph 1 of the 1973 agreement provided as follows:

KOCH agrees to convey Parcel A to IMPERIAL in exchange for a conveyance by IMPERIAL of the fee title in and to Parcel B (including the

reversionary interests in all improvements) and the lessor's interest under the long-term leases covering the tracts which compose Parcel B.

## Paragraph 2 of the 1973 agreement provided as follows:

IMPERIAL agrees that all ground rentals from said Parcel B shall be paid to KOCH beginning June 1, 1973. Ground rent for all apartment units which remain unsold as of June 1, 1973 shall be paid by IMPERIAL to KOCH until sold to individual purchasers, at which time any liability for further ground rent payment to IMPERIAL for that unit shall cease. Subject to the other terms and conditions herein, the exchange of deeds shall be consummated on June 1, 1973 and all taxes and rentals shall be prorated as of that date. In the event that at the closing date IMPERIAL has not completed its application for rezoning, then the closing may be postponed to an additional sixty (60) days to enable IMPERIAL to complete the application for rezoning. However, if the closing date is extended for this reason, all proration of rentals and taxes will still be made as of June 1, 1973.

## Paragraph 5 of the 1973 agreement provided as follows:

Prior to the closing date the parties hereto agree:

(a) KOCH shall execute a warranty deed to IMPERIAL covering Parcel A, and shall deposit the deed with its attorney for inspection and approval by IMPERIAL'S attorney.

(b) IMPERIAL shall execute a warranty deed covering Parcel B to KOCH and shall deposit the deed with its attorney for inspection and approval by KOCH's attorney.

(c) Upon approval of the respective deeds, the attorneys shall exchange the deeds for recording.

(d) The deeds shall convey title free and clear of all liens and encumbrances except the leases on Parcel B, easements and restrictions of record, and taxes for the year 1973.

## Paragraph 7 of the 1973 agreement provided as follows:

In order to facilitate the subordination of the fee title where required, KOCH agrees to give a power of attorney to a resident of either Pinellas County or Hillsborough County empowering such attorney-in-fact to execute subordination agreements whereby the fee title to an individual condominium is subordinated to any mortgage placed on such condominium by the initial purchaser of a condominium unit.

Parcel B was made up of 5 subparcels, each developed as condominium parcels under the Florida Condominium Act and each subject to certain 99-year leases as follows:

| Name of condominium subparcel | Date of long-term lease | Yearly amount of original rent | Yearly amount of rent prior to exchange | Next date on which rent may be increased | Date of termination of lease |
|---|---|---|---|---|---|
| Imperial Park Cooperative Apartments I ................................ | 6/1/67 | $6,708 | $7,888 | 6/1/72 | 5/30/2066 |
| Imperial Park Cooperative Apartments II .............................. | 7/1/69 | 7,200 | 7,200 | 7/1/74 | 6/30/2068 |
| Imperial Park Condominium ................................. | 12/24/70 | 12,222 | 12,222 | 12/24/75 | 12/23/2069 |
| Mission Hills Condominium Villas ......................... | 11/1/71 | 74,029 | 74,029 | 11/1/76 | 10/31/2070 |
| Chateau Belleair Condominium ................................. | 4/1/72 | 39,500 | 39,500 | 4/1/77 | 3/31/2071 |

Imperial Park Condominium, Imperial Park Cooperative Apartments I, and Imperial Park Cooperative Apartments II consisted of 80 condominium units on approximately 9 acres of land. Mission Hills Condominium Villas consisted of 477 condominium units on approximately 64 acres. Chateau Belleair Condominium consisted of 122 condominium units on approximately 7 acres of land.

The provisions contained in the long-term leases covering each of the 5 subparcels and the typical pattern of development of each of those subparcels were similar, and the long-term lease and pattern of development of the Mission Hills Condominium Villas (hereinafter Mission Hills) are representative.

Prior to October 1, 1971, Imperial Homes Corp. held the Mission Hills parcel in fee simple. On October 1, 1971, Imperial Homes Corp., as lessor, leased the Mission Hills parcel to Imperial for a term of 99 years commencing on November 1, 1971, and ending on October 31, 2070. Imperial then constructed 477 condominium apartments together with recreational facilities on the property pursuant to a declaration of condominium and sold the condominium apartments to third-party purchasers.[3]

Under provisions of the long-term lease the lessor (Imperial Homes Corp.) was required to subordinate the fee interest to allow the lessee (Imperial) to secure financing for the improvements. However, the fee owner was obligated to subordinate his interest only once, and the original mortgages could not be increased.[4] The lease called for an annual rental of $74,029.80, to

---

[3]Prior to the 1973 exchange of property with the partners, Imperial Homes Corp. was merged into Imperial.

[4]The lease covering Mission Hills, although not typical in this respect, also provided that—

be adjusted at the end of the sixth year and every 5-year period thereafter during the term of the lease on the basis of the cost of living index as reflected by the National Consumer Price Index. The lessor was given a lien, "paramount to all others," on every right of the lessee and the building placed on the premises to secure "the payment of rents, taxes, assessments, insurance premiums, charges, liens, penalties, and damages herein convenanted to be paid by the Lessee." The lessee agreed to keep and maintain in good repair all buildings and improvements on the property. The lessor retained the right "to enter upon the premises at all reasonable times to examine the condition and use thereof." Further, the lessor retained the right to enter the premises and make emergency repairs "to protect said property" in case of damage from fire, windstorm, or other casualty. A breach of these and other covenants entitled the lessor, at the end of specified grace periods, to declare the lease to be terminated and the term ended and to take possession of the property.

Each Mission Hills unit was conveyed by a warranty leasehold condominium deed which granted the purchaser an undivided percentage interest or share in the common elements appurtenant to the condominium parcel in accordance with and subject to the convenants, conditions, restrictions, easements, terms, and other provisions of the declaration of condominium. The warranty leasehold condominium deed also provided that the transfer was subject to the conditions of the long-term lease (between Imperial and Imperial Homes Corp.) and that the premises conveyed in the warranty leasehold condominium deed would revert to the lessor of the property in accordance with the provisions of such lease on October 31, 2070. The purchasers of the separate units in Mission Hills individually obligated themselves under the long-term lease dated October 1, 1971, to pay their respective share of the $74,029.80 annual rent due to Imperial Homes Corp. which amount would be adjusted upwards in the manner heretofore described.

---

"in the event the leasehold is submitted to Condominium ownership that Lessor will, if requested * * * by Lessee herein, join in individual mortgages in each of the Condominium parcels, provided that said mortgages are used for the purpose of paying and satisfying the initial construction and/or permanent mortgages used by Lessee for the constructing of the leasehold improvements (if any, or if same, has not already been paid and satisfied) * * *"

Although the rent was generally collected by the condominium association and remitted to the lessor in one payment, the lease pertaining to Mission Hills, the conditions of which the condominium purchasers were subject to, provided that the lessor could look only to the individual owners of the respective condominium units in the event of a delinquent rental payment. The lease also provided, among other recitals, that the ad valorem property taxes on the underlying real estate were to be apportioned among the individual condominium owners, that the lessee was obligated to maintain various types of insurance coverage for the benefit of the lessor, and that any improvements on the leased property had to be made with the approval of the lessor.

The partners by warranty deed dated May 14, 1973, conveyed the fee simple interest in the Glen Oaks Golf Club property to Imperial pursuant to the 1973 agreement. After certain zoning problems concerning the Glen Oaks Golf Club were resolved, Imperial, by warranty deed dated July 27, 1973, conveyed to the partners the five subparcels making up Parcel B. Prior to the exchange, the partners held the Glen Oaks Golf Club property for productive use in a trade or business. Following the exchange, the partners held the property received for productive use in a trade or business or for investment.

The partnership's basis in the Glen Oaks Golf Club property was $26,018 on the date of the exchange. The U.S. Partnership Return of Income for the partnership for 1973 did not report any gain attributable to the 1973 exchange and, thus, the individual partners did not report any gain attributable to that exchange.

In the notice of deficiency issued to each of the partners, respondent determined, among other adjustments, that the 1973 exchange did not constitute and "exchange solely in kind" for purposes of section 1031. Respondent found that the fair market value of the property received by the partnership in the 1973 exchange was $2 million and, consequently, determined that the partnership realized a long-term capital gain in the amount of $1,973,982, allocating to each partner his distributive share of such gain.

On March 27, 1974, Carl E. Koch and Paula Koch (hereinafter the Kochs) and U.S. Home of Florida, Inc. (hereinafter U.S. Home), entered into an agreement (hereinafter the 1974 agreement) whereby the Kochs agreed to convey in excess of 700

platted lots in the Chautauqua Subdivision, Pinellas County, Fla., or approximately 89 acres of real estate described in the 1974 agreement as "Parcel A" to U.S. Home in exchange for a conveyance by U.S. Home to the Kochs of certain property designated in the 1974 agreement as "Parcel B." The 1974 agreement was substantially identical to the 1973 agreement described above.

The Chautauqua Subdivision is located on both sides of U.S. Highway No. 19, approximately 1,000 feet southeast of the intersection of U.S. Highway No. 19 and Countryside Blvd. in Pinellas County, Fla. The property was unimproved in 1974 prior to the exchange and was covered with an overgrowth of various types of Florida native wild plants.

Parcel B was made up of 12 subparcels, each developed as condominium subparcels under the Florida Condominium Act and each subject to certain 99-year leases as follows:

| Name of condominium subparcel | Date of long-term lease | Amount of original rent | Amount of rent prior to exchange | Next date on which rent may be increased | Date of termination of lease |
| --- | --- | --- | --- | --- | --- |
| Imperial Court Condominium Apartments I | 10/1/67 | $12,972 | $12,972 | 10/1/76 | 9/30/2066 |
| Imperial Court Condominium Apartments II | 7/2/68 | 5,580 | 5,580 | 7/2/77 | 7/1/2067 |
| Imperial Court Condominium Apartments III | 8/7/68 | 6,348 | 6,348 | 8/7/77 | 8/6/2067 |
| Imperial Court Condominium Apartments IV | 12/26/68 | 6,228 | 6,228 | 12/26/77 | 12/24/2067 |
| Imperial Court Condominium Apartments V | 12/26/68 | 6,228 | 6,228 | 12/26/77 | 12/24/2067 |
| Greenbriar Condominium Apartments I | 5/23/69 | 5,532 | 5,532 | 5/23/78 | 5/22/2068 |
| Greenbriar Condominium Apartments II | 5/17/70 | 5,773 | 5,773 | 5/17/79 | 5/16/2069 |
| Greenbriar Condominium Apartments III | 5/17/70 | 5,773 | 5,773 | 5/17/79 | 5/16/2069 |
| Bay Palms Condominium I | 9/1/71 | 8,400 | 8,400 | 9/1/76 | 8/31/2070 |
| Bay Palms Condominium II | 4/1/72 | 8,400 | 8,400 | 4/1/77 | 3/31/2071 |
| Bay Palms Condominium III | 7/31/72 | 8,400 | 8,400 | 7/31/77 | 7/30/2071 |
| Highland Lakes Condominium I | 6/1/73 | 16,512 | 16,512 | 5/30/78 | 5/31/2072 |

Imperial Court Condominium Apartments I, II, III, IV, and V consisted of a total of 120 condominium units on approximately 5 acres of land. Greenbriar Condominium Apartments I, II, and III consisted of a total of 54 condominium units on approximately 3 acres of land. Bay Palms Condominium Apartments I, II, and III consisted of a total of 84 condominium units on approximately 5 acres of land. Highland Lake Condominium I consisted of a total of 64 condominium units on approximately 7 acres of land.

The typical pattern of development of each of the 12

subparcels and the long-term lease covering each of these 12 subparcels were similar to the pattern of development and long-term lease described above with respect to the Mission Hills Condominium Villas exchanged under the 1973 agreement.

Exceptions to the typical pattern are Imperial Court Condominium Apartments I through V (hereinafter Imperial Court) and Greenbriar Condominium Apartments I through III (hereinafter Greenbriar) where the two original long-term leases covering all of Imperial Court and all of Greenbriar were canceled after construction of the apartment buildings. Thereafter the land as improved was subdivided into smaller condominium parcels and separate leases were executed to cover each such subdivided parcel. The lessor continued to receive the same rent. Imperial as lessee then sold and assigned its lessee's leasehold in the subdivided condominium parcels by warranty leasehold condominium deeds.

By warranty deed dated May 11, 1974, the Kochs conveyed the Chautauqua Subdivision to U.S. Home pursuant to the 1974 agreement. By warranty deed dated May 29, 1974, U.S. Home conveyed to the Kochs the 12 subparcels making up Parcel B. Prior to the exchange, the Kochs held the Chautauqua Subdivision for investment. Following the exchange, the Kochs held the 12 subparcels making up Parcel B for productive use in a trade or business or for investment.

The Kochs had a basis in the Chautauqua Subdivision in the amount of $3,487 on the date of the exchange. They did not report any gain attributable to the 1974 exchange on their joint Federal income tax return for 1974.

In the statutory notice of deficiency issued to the Kochs, respondent determined, among other adjustments, that the 1974 exchange did not meet the provisions of section 1031. Respondent found that the fair market value of the property received by the Kochs in the 1974 exchange was $961,460 and, accordingly, determined that the Kochs recognized a long-term capital gain (after deducting selling expenses) in the amount of $956,329.67 for 1974.

## OPINION

During 1973 and 1974, petitioners transferred the Glen Oaks Golf Club and the Chautauqua Subdivision to Imperial and U.S. Home, respectively, and received from those corporations 17

parcels of real estate which were subject to 99-year condominium leases. The parties have stipulated that both sets of properties were held either for productive use in a trade or business or for investment. They also agree that the transactions were exchanges of properties.[5] The issue thus is narrowed to whether, within the meaning of section 1031(a), the real estate subject to the 99-year leases which petitioners received and the real estate not so encumbered which they transferred in the exchanges were properties of a "like kind."

Section 1031(a) provides as follows:

No gain or loss shall be recognized if property held for productive use in trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

Petitioners contend that the long-term leases on the property which they received from Imperial and U.S. Home do not affect that property's fundamental character. Since they conveyed fee simple interests to Imperial and U.S. Home and in exchange received fee simple interests from those corporations, petitioners argue that the exchange involved properties of a like kind within the meaning of section 1031(a). Respondent maintains that, for reasons we shall discuss, the exchanged properties were not of a "like kind" and, consequently, petitioners' gain is taxable under section 1001(c). Alternatively, respondent argues that if the reversionary interests received by petitioners in the transactions had value, only those interests qualify for nonrecognition and the value of the lessors' interests is taxable as "other property" under section 1031(b). We hold for petitioner.

The basic reason for allowing nonrecognition of gain or loss on the exchange of like-kind property is that the taxpayer's economic situation after the exchange is fundamentally the same as it was before the transaction occurred. "[I]f the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested, he is not allowed to

---

[5]In his reply brief, respondent, for the first time, appears to argue that the transactions were "the purchase of existing leases" rather than an "exchange." This argument comes too late. The notices of deficiency, as well as the stipulation of facts, repeatedly refer to the transactions at issue as exchanges of properties. Moreover each of respondent's requested ultimate findings of fact characterizes the transactions as an "exchange" or a "property exchange." For example, respondent's initial request for an ultimate finding of fact states as follows:

"The exchange of a fee interest in real estate for a lessor's right to receive rent under 99 year condominium leases does not meet the like-kind of exchange requirement of section 1031(a)."

compute and deduct his theoretical loss on the exchange, nor is he charged with a tax upon his theoretical profit." H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 564; *Jordan Marsh Co. v. Commissioner*, 269 F.2d 453, 455–456 (2d Cir. 1959), revg. a Memorandum Opinion of this Court on another point; *Biggs v. Commissioner*, 69 T.C. 905, 913 (1978). The rules of section 1031 apply automatically; they are not elective. Cf. *Horne v. Commissioner*, 5 T.C. 250, 256 (1945). The underlying assumption of section 1031(a) is that the new property is substantially a continuation of the old investment still unliquidated. *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 268 (1958).

Section 1.1031(a)–1(b), Income Tax Regs.,[6] explains that the words "like kind" as used in section 1031(a) have reference to "the nature or character of property and not to its grade or quality." This means that "the distinction intended and made by the statute is the broad one between classes and characters of property, for instance, between real and personal property." *Commissioner v. Crichton*, 122 F.2d 181, 182 (5th Cir. 1941), affg. 42 B.T.A. 490 (1940). The regulations contain illustrations of this broad distinction, stating that no gain or loss is recognized if a taxpayer who is not a dealer in real estate exchanges city real estate for a ranch or farm, exchanges improved real estate for unimproved real estate, or, as discussed below, exchanges a leasehold of a fee with 30 years or more to run for unimproved real estate. Sec. 1.1031(a)–1(c), Income Tax Regs.

But not every exchange of real property interests meets the like-kind requirement. In *Fleming v. Commissioner*, 24 T.C. 818, 823–824 (1955), affd. sub nom. *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260 (1958), revg. 241 F.2d 78 (5th Cir. 1957), where a taxpayer assigned carved-out oil payments in exchange for a fee interest in real estate, this Court held the exchanged properties were not like-kind properties even though the applicable State law classified the oil payment rights as interests in real property. See also *Midfield Oil Co. v. Commissioner*, 39 B.T.A.

---

[6]Sec. 1.1031(a)–1 Property held for productive use in trade or business or for investment.

(b) As used in section 1031(a), the words "like kind" have reference to the nature or character of the property and not to its grade or quality. One kind or class of property may not, under that section, be exchanged for property of a different kind or class. The fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. Unproductive real estate held by one other than a dealer for future use or future realization of the increment in value is held for investment and not primarily for sale.

1154, 1157 (1939); *Oregon Lumber Co. v. Commissioner*, 20 T.C. 192, 197–198 (1953). On the other hand, in *Commissioner v. Crichton, supra* at 182, the court held that an exchange of an overriding royalty interest in minerals for a city lot was a like-kind exchange. See also Rev. Rul. 68–331, 1968–1 C.B. 352 (interest in a producing oil and gas lease exchanged for a ranch); Rev. Rul. 55–749, 1955–2 C.B. 295 (land for perpetual water rights).[7] The main distinction between the two transactions is the duration of the interests—an overriding royalty interest continues until the mineral deposit is exhausted whereas a carved-out oil payment right terminates usually when a specified quantity of minerals has been produced or a stated amount of proceeds from the sale of minerals has been received.

Thus, section 1031(a) requires a comparsion of the exchanged properties to ascertain whether the nature and character of the transferred rights in and to the respective properties are substantially alike. In making this comparison, consideration must be given to the respective interests in the physical properties, the nature of the title conveyed, the rights of the parties, the duration of the interests, and any other factor bearing on the nature or character of the properties as distinguished from their grade or quality. Significantly, as the standard for comparison, section 1031(a) refers to property of a like—not an identical—kind. The comparison should be directed to ascertaining whether the taxpayer, in making the exchange, has used his property to acquire a new kind of asset or has merely exchanged it for an asset of like nature or character.

In the instant case, petitioners exchanged improved real estate for improved real estate in 1973 and unimproved land for improved real estate in 1974. Quite clearly, apart from the long-term leases outstanding on the 17 parcels received by petitioners, the properties were of a like kind, and the only question is whether the leases disqualify the exchange. We do not think they do. When Imperial and U.S. Home granted the long-term leases, those corporations retained fee simple ownership of the

---

[7]Rev. Rul. 55–749, 1955–2 C.B. 295, holding that an exchange of land for perpetual water rights is an exchange of like-kind property, states:

"where the water right, whatever its size, is in perpetuity, as distinguished from a right to a specific total amount of water or to a specific amount of water for a limited period the water rights and the land involved are regarded as sufficiently similar to constitute property of like kind within the meaning of section 1031(a) of the Code."

17 parcels. In 1973 and 1974, the corporations transferred their fee simple title of those 17 parcels to petitioners in exchange for the fee simple title of petitioners' properties. Both parties thus parted with their entire interests. The exchanged interests were perpetual in nature, and they thus meet the duration-of-the-rights test. Petitioners' money is still tied up in real property of the same class or character as they owned before the exchange. We conclude that the exchange was made of properties of a like kind.

Respondent argues, however, that the substance of the transaction was an exchange of petitioners' real property for two separate rights: (1) The right of reversion, which had nominal value and should be disregarded, and (2) the right to an "income stream" represented by the rent under the 99-year leases. Petitioners' only right to the land, respondent argues, is a right to repossess it for nonpayment of the rent. We do not agree.

Petitioners' right to the rent is not a separate and distinct item of property but is a part of the bundle of rights incident to the ownership of the fee. That bundle of rights and its related obligations are inextricably bound up in the fee simple interest. The long-term leases contain numerous provisions, some of which are briefly summarized in our Findings, securing not only the payment of the rent but also protecting the value of the reversionary interest. Breach of any one of a long series of covenants entitle petitioners to terminate the leases and take possession of the property. Similarly, petitioners acquired important burdens of ownership also wrapped up in the fee simple interest. For example, under Florida Statutes Annotated section 711.19(1),[8] each condominium parcel is separately assessed for ad valorem taxes. Under the leases, the lessees agreed to pay the ad valorem taxes, but the assessment, under the principles of Florida law, is against the fee title, not the leasehold. See, e.g., *Jacksonville Express Authority v. Milford,* 115 So.2d 778 (Fla. Dist. Ct. App. 1959). The lessees' failure to pay the taxes, therefore, would mean that petitioners would be required to pay them or lose their property, the reversionary interest as well as the right to rent.[9]

---

[8]This section was repealed effective Jan. 1, 1977, but was reenacted as Fla. Stat. Ann. sec. 718.120.

[9]If the only substantial right petitioners acquired was an "income stream" and the reversionary interest should be disregarded, it would logically follow that the execution of a 99-year lease

Respondent's argument that the right to the reversion and the right to rent under the leases are separable rights is contrary to the position which the Commissioner has taken and which this Court has adopted in numerous prior cases. See, e.g., *Michaelis v. Commissioner*, 54 T.C. 1175, 1179–1180 (1970); *Schubert v. Commissioner*, 33 T.C. 1048, 1053–1054 (1960), affd. 286 F.2d 573 (4th Cir. 1961), cert. denied 366 U.S. 960 (1961); *Peters v. Commissioner*, 4 T.C. 1236, 1240 (1945); *Friend v. Commissioner*, 40 B.T.A. 768, 771 (1939), affd. 119 F.2d 959 (7th Cir. 1941), cert. denied 314 U.S. 673 (1941). In *Friend v. Commissioner, supra*, the decedent's estate included real estate subject to a 99-year lease. The estate tax appraisal placed a large value on the lessor's interest and a nominal value on the reversionary interest. The decedent's estate argued that it was entitled to amortize the lessor's interest during the life of the lease. Rejecting this argument, the Board of Tax Appeals said (40 B.T.A. at 771):

> We are not dealing here with the case of a taxpayer who has acquired by purchase or by inheritance a right to receive a periodic sum of money for a term of years. Clearly if a taxpayer had invested money in acquiring such right he would be entitled to deduct from the rents received each year an aliquot part of the cost of his investment; for he would be entitled under the statute to recover back the cost of his investment without being taxed thereon.

> What we are dealing with here is the case of an estate which owns the fee of real estate which is advantageously leased. The estate had the fee simple title to the real estate located at 6308–6314 South Halsted Street. In a fee simple title all lesser estates, rights, titles, and interests merge. *William Robert Farmer*, 1 B.T.A. 711. We think it immaterial that for the purpose of determining the tax liability in these proceedings the respondent determined the value of the fee by separately valuing the right to receive rentals over the terms of the leases and the remainder interests.

Similarly, in *Peters v. Commissioner, supra*, the taxpayer exchanged his shares in a Massachusetts voluntary association in

---

constitutes a disposition of the property. Yet it is well established that the execution of such a lease is not a transaction in which income is realized. It is only when the lessor-owner parts with his fee simple interest that a disposition occurs. See, e.g., *Commissioner v. Estate of Simmers*, 231 F.2d 909, 914 (4th Cir. 1956), affg. 23 T.C. 869 (1955); *Welsh Homes, Inc. v. Commissioner*, 32 T.C. 239, 250–252 (1959), affd. on other grounds 279 F.2d 391 (4th Cir. 1960); *Lipsitz v. Commissioner*, 21 T.C. 917, 936 (1954), affd. 220 F.2d 871 (4th Cir. 1955), cert. denied 350 U.S. 845 (1955); *Lakeside Garden Developers, Inc. v. Commissioner*, T.C Memo. 1976–290; *Friedman v. Commissioner*, T.C. Memo. 1977–201. Except to win the case at hand, it would be surprising to hear respondent argue or concede that a long-term lease is a disposition of real property and that the "rent," subject to adjustment for basis recovery and imputed interest, is taxable as capital gain.

a partial liquidation for real property subject to a 30-year lease and sought to amortize the value of his right to the rents over the term of the lease. The Court said (4 T.C. at 1240):

> when this petitioner acquired her undivided interest in the reversion she acquired *as an incident thereof* the right to receive her pro rata share of the rent from the tenant. *She did not acquire as a separate and distinct item of property the right to receive rental income; she acquired this right as a part of the bundle of rights incident to ownership of the fee.* This right of ownership and all other rights of a fee owner were subject to the outstanding leasehold estate, and were acquired by the beneficiaries at a value not here in dispute. * * * [Emphasis added.]

In response to the taxpayer's argument that the lease, "a separate property right," was a favorable one, the Court added (4 T.C. at 1240):

> Since we are convinced that the right to receive income from the tenant is a part of the realty and passed by the deed of conveyance, it is immaterial whether the lease was advantageous or detrimental to the fee owner. If advantageous as the evidence here indicates, the value of the property as a whole would be increased; if detrimental, the value would be depressed.

It is clear, therefore, that the fee simple interests which petitioners acquired cannot be segmented into two separate sets of rights. The right to the rent is merely an incident of the ownership of the fee simple interest. It automatically follows the reversionary interest and vests with the owner of the fee. *Gray v. Callahan*, 197 So. 396, 398–399 (Fla. 1940).

Quite true, as respondent argues, the long-term leases prevent petitioners from taking physical possession of the properties and using them for other purposes as long as the leases remain in effect. But section 1031(a) "was not intended to draw any distinction between parcels of real property however dissimilar they may be in location, in attributes and in capacities for profitable use." *Commissioner v. Crichton, supra* at 182. Thus, the overriding royalty interest exchanged for a city lot in *Commissioner v. Crichton, supra,* and the interest in the producing oil leases exchanged for the ranch in Rev. Rul. 68–331, *supra,* gave the owners of such interests no right to possess the physical property. The overriding royalty interests involved in those transactions were more like an "income stream," if we understand the term as used in respondent's argument, and more restricted in their potential use than the properties petitioners acquired in the instant case. Yet the court in

*Commissioner v. Crichton, supra,* and the Commissioner in Rev. Rul. 68–331, *supra,* recognized that such an exchange falls within the statute.[10]

Respondent also relies heavily upon the "negative inference" which, he says, is to be drawn from section 1.1031(a)–1(c), Income Tax Regs.[11] That regulation provides that the exchange of a leasehold with 30 or more years to run for a fee simple interest in land is an exchange of property of a like kind. Respondent contends that "if the lessee's interest in the land is equal to a fee interest in the land, by negative inference, the lessor's interest in the land is not equal to a fee interest in the land." We do not agree.

Respondent's argument does violence to the statutory language. Section 1031(a) does not require that the exchanged property interests be equal. As pointed out above, the section speaks only in terms of the exchange of property of a "like," not identical, kind. Moreover, the regulation (sec. 1.1031(a)–1(c), Income Tax Regs.) does not characterize the 30-year leasehold as equivalent to a fee but merely as like in kind to realty. Nor does the regulation minimize or characterize the owner-lessor's interest in such property. Both the lessor and lessee have interests in the real property. The lessee has a leasehold interest which, if in excess of 30 years, is like in kind to real estate for purposes of section 1031(a).[12] The lessor retains the fee simple title to the real estate and is clearly eligible for section 1031(a) treatment in an exchange for other real estate.

There is no logical necessity to deny section 1031(a) treatment to the lessor merely because the lessee is also eligible for such treatment. The law is settled that a fee owner can convey

---

[10]Respondent fashions a lengthy argument based on sec. 1031(e) which provides that: "For the purposes of this section, livestock of different sexes are not property of a like kind." We fail to see the connection between this provision and the exchange of fee simple interests in land in the instant case. Obviously, Congress could have provided that an exchange of an unleased fee for a leased fee does not involve property of a like kind, but it has not done so.

[11]Sec. 1.1031(a)–1(c), Income Tax Regs., provides:

"No gain or loss is recognized if * * * a taxpayer who is not a dealer in real estate exchanges * * * a leasehold of a fee with 30 years or more to run for real estate * * * "

[12]Significantly, sec. 1031(a) denies recognition of losses as well as gains. This regulation heretofore appears to have been used mainly to combat what the Commissioner conceived to be abuse cases involving sales or gifts and leasebacks. See, e.g., *Century Electric Co. v. Commissioner,* 192 F.2d 155, 160 (8th Cir. 1951), affg. 15 T.C. 581 (1950), cert. denied 342 U.S. 954 (1952); *Jordan Marsh Co. v. Commissioner,* 269 F.2d 453, 455–456 (2d Cir. 1959), revg. a Memorandum Opinion of this Court on another point.

mineral interests or perpetual water rights in a like kind exchange while retaining the surface interests in the land. *Commissioner v. Crichton, supra;* Rev. Rul. 68–331, 1968–1 C.B. 352; Rev. Rul. 55–749, 1955–2 C.B. 295. Thereafter, the fee simple interest in the surface could undoubtedly be exchanged for other land under section 1031(a). The owner of the mineral interests or perpetual water rights could also make qualifying section 1031(a) exchanges for other land. Similarly, in the instant case, both the lessor-petitioners and the lessee have interests in the same real estate, and both are eligible for section 1031(a) treatment.

Indeed, the courts have recognized that the lessor in a long-term lease remains the owner of the property. In *Pembroke v. Helvering,* 70 F.2d 850 (D.C. Cir. 1934), affg. 23 B.T.A 1176 (1931), the taxpayer-owner executed a 99-year lease in consideration of annual rents and a fee interest in other property. The court held that the value of the fee simple interest in the other property constituted income to the taxpayer as an advance rental given in consideration of the execution of the lease, and that the predecessor of section 1031 did not apply. The Commissioner's rulings have also recognized the same rule. See Rev. Rul. 66–209, 1966–2 C.B. 299; Rev. Rul. 72–601, 1972–2 C.B. 467. The reason for the rule is that owner-lessor does not part with his real property but merely transfers the right to use it for a period of years. The execution of a long-term lease is not the conveyance of a fee.[13]

The rationale of the foregoing discussion disposes also of respondent's argument that the value of the lessor's interests is taxable as "other property" under section 1031(b). The lessor's fee simple interest cannot be so fragmented. Also, since we have held that the exchanges here in dispute were exchanges of property of a like kind, no gain is recognized under section 1031(a), and we do not reach the issue as to the valuation of the various interests.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[13]Rev. Rul 72–601, 1972–2 C.B. 467, appears to recognize at least implicitly that an exchange of a remainder interest in one piece of real property for a life estate (where the life expectancy of the life

tenant exceeds 30 years) in another piece of real property would be an exchange of property of a like kind. See also Rev. Rul. 78–4, 1978–1 I.R.B. 11. It would be difficult to distinguish such a remainder interest from a reversionary interest for purposes of sec. 1031(a).