CALIFORNIA FEDERAL LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6753–79.    Filed January 21, 1981.

*Thomas R. Sheppard, Robert Joe Hull,* and *Michael D. Fernhoff,* for the petitioner.
*David P. Fuller,* for the respondent.

## OPINION

SCOTT, *Judge*: Respondent determined a deficiency in the Federal income tax of the California Federal Life Insurance Co. for calendar year 1975 in the amount of $2,480.27.

The issues for decision are: (1) Whether U.S. Double Eagle gold coins are considered "money" to be valued at their face amount or "property" to be valued at their fair market value for

purposes of determing the amount realized under section 1001(b), I.R.C. 1954,[1] when petitioner exchanged 110,079.90 Swiss francs for 175 U.S. Double Eagle gold coins on March 31, 1975; and (2) if the U.S. Double Eagle gold coins are "property" within the meaning of section 1001(b), whether the exchange of Swiss francs for the U.S. Double Eagle gold coins constitutes a nontaxable like-kind exchange under section 1031(a).

All of the facts have been stipulated and are found accordingly.

California Federal Life Insurance Co. (petitioner) is a corporation organized under the laws of the State of Arizona and has its principal office in Phoenix, Ariz. An income tax return (Form 1120-L), signed by petitioner's president, Warren C. Cordner, was timely filed with the Internal Revenue Service Center, Ogden, Utah.

Petitioner is solely owned by a grantor trust entitled "E.B.O., W.C. and E.C. Cordner." The trustee of this trust is the Bank of America NTSA.

Although petitioner has never conducted business in Switzerland, in March 1974, it purchased 110,079.90 Swiss francs for $35,158.97. Petitioner held these Swiss francs as an investment until March 31, 1975. On that date, petitioner exchanged the 110,079.90 Swiss francs for 175 U.S. Double Eagle gold coins. No other property or money was involved in this transaction.

On April 1, 1975, the Wall Street Journal reported that the March 31, 1975, exchange rate for Swiss francs was 1 Swiss franc for 0.3945 U.S. dollars. Accordingly, the 110,079.90 Swiss francs exchanged by petitioner on March 31, 1975, had a current dollar value of $43,426.52. At the same time, each of the 175 U.S. Double Eagle gold coins had a face value of $20, for an aggregate face value of $3,500. As a result of the bullion content and numismatic worth of U.S. Double Eagle gold coins, their fair market value exceeds their face value. The numismatic component of their value depends upon the number of coins minted, their date, their particular type, and their condition. The bullion component of their value varies with the changes in the price of gold in the world market. As indicated in Coin World magazine, a coin collectors' reference publication, U.S. Double Eagle gold

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the year in issue.

coins other than those labeled "very rare" had fair market values from $275 to $2,900 during the week ending March 19, 1975, and very rare Double Eagle gold coins were valued as high as $18,000. The Coin Dealer newsletter, another reference publication, indicated that for the week ending April 4, 1975, the most common U.S. Double Eagle gold coins had a fair market value ranging between $225 and $2,650, while very rare Double Eagle gold coins were valued as high as $15,500.

On April 3, 1975, petitioner declared a 14-cent dividend on each of the 25,000 shares of its outstanding common stock owned by its sole shareholder. Thereafter, petitioner paid the declared dividend in the Double Eagle gold coins which it had acquired in the March 31, 1975, transaction. Petitioner issued to its sole shareholder a "Form 1099-Div." which showed a dividend distribution of $3,500 for 1975. Petitioner's earnings and profits were reduced by this same amount.

On its income tax return for calendar year 1975, petitioner reported a capital loss in the amount of $31,658.97 with respect to the March 31, 1975, transaction, of which $29,906.34 was reported as a long-term capital loss, and $1,752.63 was reported as a short-term capital loss. In his notice of deficiency, respondent disallowed the claimed capital losses and stated that:

(a) It is determined that you realized a long-term capital gain of $8,267.55 for the calendar year 1975 when you exchanged 110,079.90 Swiss Francs for 175 United States $20.00 Double Eagle Gold Coins.

Section 1001 controls the treatment of recognition of gain or loss upon the disposition of property.[2] Section 1001(b) provides that the amount realized from the sale or other disposition of

---

[2]Sec. 1001 provides in part as follows:

SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

    (a) COMPUTATION OF GAIN OR LOSS. —The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

    (b) AMOUNT REALIZED. —The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. In determining the amount realized—

    \*       \*       \*       \*       \*       \*       \*

    (c) RECOGNITION OF GAIN OR LOSS. —In the case of a sale or exchange of property, the extent to which the gain or loss determined under this section shall be recognized for purposes of this subtitle shall be determined under section 1002.

property, including money, is the amount of money received plus the fair market value of the property, other than money, received. Therefore, section 1001(b) requires that money shall be valued at its face value while assets other than money shall be valued at their fair market value at the time of sale or disposition.

Relying upon numerous cases and statutory law,[3] petitioner takes the position that the term "money" as found within section 1001(b) is equivalent to any form of legal tender, that U.S. Double Eagle gold coins are legal tender, and that therefore the Double Eagle gold coins must be considered "money" within the meaning of section 1001(b). On the other hand, citing many of the same cases and statutory law, respondent takes the position that Congress intended the term "money" in section 1001(b) to apply to currently circulating mediums of exchange. Respondent does not dispute that the U.S. Double Eagle gold coins when issued were considered money, but he asserts that the 1934 withdrawal of these gold coins from circulation and their collector item characteristics thrust the Double Eagle gold coins into the section 1001(b) category of "property (other than money)."

We are in agreement with respondent. Since our conclusion is not based on a determination of whether technically U.S. Double Eagle gold coins are legal tender, we will limit our discussion of the statutory law cited by petitioner to that necessary to an understanding of the conclusion we reach. By Executive Order 6260 (Aug. 28, 1933), President Franklin D. Roosevelt ordered, pursuant to the Emergency Banking Relief Act of 1933, 48 Stat. 1, that all persons holding gold coins, bullion, and certificates file returns and submit the gold to the Secretary of the Treasury. The Executive order provided several exceptions to this sweeping rule, amongst which was possessors of "Gold coin having a recognized special value to collectors of rare and unusual coin." Exec. Order 6260, secs. 3(b) and 5 (Aug. 28, 1933).

Thereafter, pursuant to the Gold Reserve Act of 1934, 48 Stat. 337, partially codified in 31 U.S.C. sec. 315(b),[4] Congress discon-

---

[3]The statutory law upon which petitioner relies includes the Emergency Banking Relief Act of 1933, 48 Stat. 1; the Gold Reserve Act of 1934, 48 Stat. 337; and the Agricultural Adjustment Act, 48 Stat. 31 (1933).

[4]31 U.S.C. sec. 315(b) states:

tinued all gold coinage and withdrew from circulation the existing gold coins. The basis of this action was that American citizens should not be able to make a "profit on gold holdings as the direct result of Government depreciation in the gold content of the dollar." H. Rept. 292, 73d Cong., 2d Sess. 2 (1934). Section 2 of the Gold Reserve Act of 1934, *supra*, provided that "any and all gold coins and gold bullion shall pass to and are hereby vested in the United States." Thus, on orders of the Secretary of the Treasury, gold which remained in private hands in 1934 was to be delivered to the Government. The Government would pay the private owner in dollars in amounts equal to the face value of the gold delivered. See *Nortz v. United States*, 294 U.S. 317 (1935); *Perry v. United States*, 294 U.S. 330 (1935). However, as with the Emergency Banking Relief Act of 1933, *supra*, rare and unusual gold coins could be acquired and held by private individuals. U.S. Treasury Department provisional regulations issued under the Gold Reserve Act of 1934, sec. 20 (Jan. 30 and 31, 1934).

We are of the opinion that the "rare and unusual gold coin" exception applied to coins that would be traded in the marketplace for values far in excess of their face amounts. It was recognized that coins which were permitted to be held under the Gold Reserve Act of 1934 would have characteristics dissimilar to gold coins circulating as legal tender prior to Executive Order 6260, *supra*, and the Gold Reserve Act of 1934, *supra*.

As stipulated by the parties, the U.S. Double Eagle gold coins involved in the March 31, 1975, exchange had numismatic worth in excess of their face value. They are unusual and rare coins within the exception provided by the provisional Treasury regulations, and therefore, they fall outside the scope of the Gold Reserve Act of 1934, *supra*. Accordingly, regardless of whether technically the Double Eagle gold coins might be legal

---

Sec. 315b. Gold coinage discontinued; existing gold coins withdrawn from circulation; coins and gold to be formed into bars

No gold shall hereafter [after Jan. 30, 1934] be coined, and no gold coin shall hereafter [after Jan. 30, 1934] be paid out or delivered by the United States: *Provided, however,* That coinage may continue to be executed by the mints of the United States for foreign countries in accordance with the Act of January 29, 1874 [31 U.S.C. sec. 367]. All gold coin of the United States shall be withdrawn from circulation and, together with all other gold owned by the United States, shall be formed into bars of such weights and degrees of fineness as the Secretary of the Treasury may direct.

tender, they are not circulating legal tender, or "money," within the meaning of section 1001(b). Rather, these gold coins are "property (other than money)" to be valued at their fair market value on March 31, 1975.

This conclusion is supported by a number of other factors.[5] First, the March 31 and April 3, 1975, transactions, whereby the Swiss francs were exchanged for the U.S. Double Eagle gold coins and subsequently a dividend was paid in Double Eagle gold coins to the corporation's sole shareholder, a grantor trust entitled "E.B.O., W.C. & E.C. Cordner," were in substance an acquisition of property, valuable coins, by petitioner, which property petitioner thereafter transmitted to its shareholder. The tax result of the transaction should be in keeping with its substance.

Furthermore, this case is similar to that of *Cordner v. United States*, an unreported case (C.D. Cal. 1980, 45 AFTR 2d 80–1677, 80–1 USTC par. 9441). There, plaintiffs were Evelyn C. Cordner and Warren C. Cordner. Mr. Cordner owned 92.5 percent of the stock of First Thrift Investors, which in turn, wholly owned First Thrift of America. On June 10, 1975, First Thrift of America declared a dividend which was paid to First Thrift Investors on June 12, 1975, in the form of 289 U.S. Double Eagle gold coins. On June 10, 1975, First Thrift Investors declared a dividend which was subsequently paid in the rare gold coins received from First Thrift of America. On their 1975 income tax return, plaintiffs reported the First Thrift of America dividend in the amount of $5,500, the face value of the coins received. The Government took the position that the plaintiffs received a dividend in the amount of the fair market value of the Double Eagle gold coins rather than in the amount of $5,500. The District Court noted that section 301(b)(1)(A) requires that the value of a dividend shall be the amount of money received plus the fair market value of the other property received. The District Court held that the U.S. Double Eagle gold coins were property within the meaning of section 301(b)(1)(A) and therefore should be valued at their fair market value.

---

[5]Respondent has taken the position that a taxpayer, not a dealer in coins or currency, who receives U.S. silver coins with value in excess of their face in exchange for depreciated real property realizes a taxable gain under sec. 1001 based on the excess of the fair market value of the silver coins over the adjusted basis of the real property. Rev. Rul. 76–249, 1976–2 C.B. 21. This situation is substantially similar to the instant case.

Because we have concluded that the U.S. Double Eagle gold coins are property and not money, it is necessary to consider petitioner's alternative argument that the March 31, 1975, exchange of Swiss francs for the U.S. Double Eagle gold coins constitutes a nontaxable "like kind" exchange under section 1031. Section 1031(a) provides that no gain or loss is to be recognized where property held for productive use in trade or business or for investment is exchanged solely for property of like kind to be held for productive use in trade or business or for investment.[6] However, the exchanged property cannot include stock in trade or other property held primarily for sale, stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest. Section 1.1031(a)–1(b), Income Tax Regs., states that the term "like kind" refers to "the nature or character of the property and not to its grade or quality. One kind or class of property may not * * * be exchanged for property of a different kind or class." As a result, real property may be exchanged for real property,[7] personal property may be exchanged for other personal property;[8] however, exchanges of personal property for realty do not qualify as like-kind exchanges within the meaning of section 1031.

There is no question that the Swiss francs and the U.S. Double Eagle gold coins are both personal property. The issue between the parties is whether they are of such similar nature or character as to be like-kind property.[9] Respondent argues that

---

[6]Sec. 1031(a) provides as follows:

SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVEST-
MENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND. —No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

[7]There are numerous cases involving the like-kind exchange of real property. For example, in *Braley v. Commissioner*, 14 B.T.A. 1153 (1929), property located in the city was exchanged for rural real estate. See also *Koch v. Commissioner*, 71 T.C. 54 (1978), where petitioners exchanged unencumbered parcels of realty for realty subject to 99-year condominium leases.

[8]Exchanges of personal property have included such items as exchanges of Chamber of Commerce memberships (see *C. C. Wyman & Co. v. Commissioner*, 8 B.T.A. 408 (1927)) and exchanges of cattle (see *Woodbury v. Commissioner*, 49 T.C. 180 (1967)).

[9]Respondent cites Rev. Rul. 79–143, 1979–1 C.B. 264. There, an individual taxpayer, who was

although there is an exchange of personal property for personal property, the Swiss francs are a circulating currency while the U.S. Double Eagle gold coins are exchanged in the marketplace only by numismatists. Respondent asserts that this contrasting characteristic places the exchange outside of the perimeters of a like-kind exchange.

Petitioner relies on section 1.1031(a)–1(c), Income Tax Regs., and *Commissioner v. Crichton*, 122 F.2d 181 (5th Cir. 1941), affg. 42 B.T.A. 490 (1940), for the proposition that like kind properties can have extremely diverse characteristics. For instance, in *Commissioner v. Crichton, supra*, a like-kind exchange occurred where an interest in an undivided interest in "oil, gas and other minerals, in, on and under, and that may be produced from" country land was exchanged for an undivided interest in a city lot improved with a small-town hotel. In the *Crichton* case, the Court indicated that the differences between the two real properties exchanged went to grade or quality factors rather than to the nature and character of the properties. Petitioner also relies on *Koch v. Commissioner*, 71 T.C. 54 (1978), where the taxpayer exchanged an unencumbered fee simple interest in a golf course for a fee simple interest in real estate encumbered by 99-year condominium leases. Petitioner emphasizes the test that we used in determining that the exchange was an exchange of like kind properties:

In making this comparison, consideration must be given to the respective

---

not a dealer in coins, purchased U.S. $20 gold coins as an investment. After the gold coins had appreciated, the taxpayer exchanged them for South African Krugerrand gold coins. In the aggregate, the U.S. gold coins and the Krugerrands had equal fair market values. The taxpayer intended to hold the South African Krugerrands for investment purposes. Respondent concluded that the exchange did not qualify as a like-kind exchange within the meaning of sec. 1031 since the value of the U.S. gold coins was based upon their age, the number of coins minted, their history, art aesthetics, condition, and metal content, whereas the South African Krugerrands were bullion-type coins with their value based upon their metal content alone. Because the underlying investments were determined to be not of the same nature or character, the coins were not of like kind.

Rev. Rul. 79–143, *supra*, distinguishes Rev. Rul. 76–214, 1976–1 C.B. 218. In the latter revenue ruling, an individual taxpayer, who was not a dealer in foreign or domestic currency, in 1972 purchased 100 Mexican 50-peso gold bullion-type coins as an investment. In 1974, after substantial appreciation in the value of the Mexican pesos, the taxpayer exchanged the pesos for 130 Austrian 100-corona gold bullion-type coins. At the time of the exchange, the total fair market value of the Mexican pesos was equal to the aggregate fair market value of the Austrian coronas. Respondent held that the exchange qualified as a like kind exchange within the meaning of sec. 1031(a) since both the Mexican peso and the Austrian corona were bullion-type coins and neither was a circulating medium of exchange in its country.

interests in the physical properties, the nature of the title conveyed, the rights of the parties, the duration of the interests, and any other factor bearing on the nature or character of the properties as distinguished from their grade or quality. * * * [*Koch v. Commissioner, supra* at 65.]

However, the more important language for purposes of making a determination in the instant case appears prior to that language cited by petitioner. We stated that the—

basic reason for allowing nonrecognition of gain or loss on the exchange of like-kind property is that the taxpayer's economic situation after the exchange is fundamentally the same as it was before the transaction occurred. "[I]f the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested, he is not allowed to compute and deduct his theoretical loss on the exchange, nor is he charged with a tax upon his theoretical profit." H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 564; * * * [*Koch v. Commissioner, supra* at 63.]

It is implicit in that language that where a taxpayer's economic situation after the exchange is fundamentally different from its economic situation prior to the transaction, the exchange does not encompass like-kind properties.

An examination of the evidence in the instant case shows that the section 1031(a) nonrecognition of gain or loss provision does not apply to the exchange of Swiss francs for U.S. Double Eagle gold coins. Applying the standard enunciated in the House report and *Koch v. Commissioner, supra*, petitioner's money originally purchased 110,079.90 Swiss francs, which are used in Switzerland's open market as a medium of exchange. In contrast, the U.S. Double Eagle gold coins are traded only by numismatists. Certainly, petitioner's economic situation after the exchange was far different from its economic position prior to the transaction.

Respondent further argues that the property received in the exchange was not maintained by petitioner either for productive use in business or for investment. Since we have concluded that the exchange of the Swiss francs for the U.S. Double Eagle gold coins was not an exchange of "like-kind" properties, we need not consider this argument.

*Decision will be entered for the respondent.*