Filed 12/30/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LETTERMAN DIGITAL ARTS LTD., <br><br>      Plaintiff and Appellant, <br> v. <br> CITY AND COUNTY OF <br> SAN FRANCISCO et al., <br><br>      Defendants and Respondents. | A156315 <br><br> (City & County of San Francisco <br> Super. Ct. No. CGC-16-555649) |

Letterman Digital Arts, Ltd. (Letterman), a lessee and sublessor of property in the Presidio of San Francisco (the Presidio), appeals the dismissal of its complaint against the City and County of San Francisco and Jose Cisneros, treasurer and tax collector of San Francisco (collectively, the city), to recover a refund of gross receipts taxes and business registration fees imposed on rents it received from tenants of the subleased property. Letterman contends that imposition of the tax and fee violates the tax exemption provision in section 103(c)(9) of the Presidio Trust Act.[1] We conclude that the trial court properly sustained without leave to amend the city's demurrer because the tax and fee do not contravene the provisions of the federal statute.

---

[1] The Presidio Trust Act is codified in the appendix to title 16 United States Code section 460bb. All further undesignated statutory references are to the Presidio Trust Act. We refer to the tax provision at issue as section 103(c)(9).

## BACKGROUND

1. *Taxing Power Within the Presidio as a Federal Enclave*

The Presidio, formerly a military base and now a National Park site, is located in the Golden Gate National Recreation Area in San Francisco. The Presidio is an exclusive federal enclave under the United States Constitution's Enclave Clause, article I, section 8, clause 17. California ceded the Presidio to the federal government in 1897. (Stats. 1897, ch. 56, § 1, p. 51.) California reserved only the right to serve and execute civil and criminal process. (*Standard Oil Co. v. California* (1934) 291 U.S. 242, 244.) A state or local government cannot exercise its police or taxing powers in an exclusive federal enclave except to the extent the state reserves those powers at the time the land is ceded, or the federal government later permits. (See U.S. Const., art. 1, § 8, cl. 17; *Coso Energy Developers v. County of Inyo* (2004) 122 Cal.App.4th 1512, 1519–1522; Sen.Rep. No. 1625, 76th Cong., 3d. Sess., p. 2 (1940).[2])

Prior to 1940 San Francisco had no authority to impose a tax of any kind in the Presidio. But in 1940 Congress enacted the Buck Act (4 U.S.C. §§ 105–110.), which authorizes states and local jurisdictions to impose income taxes on activities in federal areas, or on residents of such federal areas, to the same extent and with the same effect as though such land was not a federal area.[3] For purposes of the Buck Act, "income tax" means "any tax

---

[2] The trial court granted Letterman's request to take judicial notice of the Senate Report. Although Letterman does not renew its request on appeal, we likewise take judicial notice of the Senate Report. (Evid. Code, §§ 452, 459, subd. (a); *Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 752.)

[3] The statute, 4 United States Code section 106(a), provides: "No person

levied on, with respect to, or measured by, net income, gross income, or gross receipts." (4 U.S.C. § 110(c).) The Buck Act thus empowers San Francisco to impose a tax on gross receipts earned within the Presidio.

2. *The Presidio Trust Act*

In enacting the Presidio Trust Act in 1996, Congress created the Presidio Trust as a wholly-owned government corporation to manage the Presidio. (§ 103(a).) Under the Presidio Trust Act, the trust must fulfill the dual statutory purposes of preserving the historic and natural character of the Presidio and its cultural and recreational resources and making the Presidio financially self-sustainable. (§ 101(5), (6), (7); see *Presidio Historical Assn. v. Presidio* (9th Cir. 2016) 811 F.3d 1154, 1157.) The Presidio Trust Act exempts the trust from certain federal laws and regulations. (See, e.g., § 104(b) [exempting trust from procurement requirements].) It also contains the tax exemption at issue in this case, section 103(c)(9). As originally enacted, section 103(c)(9) read, "The Trust and all properties administered by the Trust shall be exempt from all taxes and special assessments of every kind by the State of California, and its political subdivisions, including the City and County of San Francisco." (Pub.L. No. 104–333 (Nov. 12, 1996) 110 Stat. 4093.) As a wholly-owned government corporation, legislation was not

---

shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area; and such State or taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such state to the same extent and with the same effect as though such area was not a Federal area."

and necessary to exempt the trust itself from taxation.[4] Legislation was necessary, however, to exempt taxation of privately held possessory interests. (See *California State Teachers' Retirement System v. County of Los Angeles* (2013) 216 Cal.App.4th 41, 56 [" ' "Privately held possessory interests in property owned by the federal government, the state, and municipalities are subject to taxation. [Citation.] Because a large proportion of California land was (and is) in public ownership, taxation of possessory interests is an important source of local government revenue." ' "].) In 2000, section 103(c)(9) was amended to read: "The Trust and all properties administered by the Trust *and all interest created under leases, concessions, permits and other agreements associated with the properties* shall be exempt from all taxes and special assessments of every kind by the State of California, and its political subdivisions, including the City and County of San Francisco." (Italics added.) The meaning of the italicized language added by the 2000 amendment is at issue in this case.[5]

3. *The Tax and Fees at Issue and Letterman's Refund Claims*

Under article 12, section 953, subdivision (a) of the San Francisco Business and Tax Regulations Code, "every person engaging in business

---

[4] As an instrumentality of the federal government, the trust would be exempt from state and local taxation even in the absence of section 103(c)(9). (See *Indian Motocycle Co. v. United States* (1931) 283 U.S. 570, 575 [Constitution impliedly prohibits state taxation of federal governmental instrumentalities]; see also 4 U.S.C. § 107(a) [expressly stating that the Buck Act does not authorize states to levy taxes on the federal government or its instrumentalities].)

[5] We grant the city's request to take judicial notice of the original version of section 103(c)(9), and comments made during a debate in the House of Representatives on the Senate's amendments to the Presidio Trust Act in 2000, as did the trial court. (Evid. Code, § 459, subd. (a).)

within the City shall pay an annual gross receipts tax." The city characterizes the tax as "a privilege tax imposed upon persons engaging in business within the City for the privilege of engaging in a business or occupation in the City." (*Id.*, subd. (b).) In addition, the city requires that each business pay an annual registration fee, which is measured by its gross receipts. (S.F. Bus. & Tax Regs. Code, art. 12, § 855, subd. (e)(1).

In September 2015, Letterman paid the city a business registration fee of $12,501 for July 2015 through June 2016. In February 2016, Letterman paid the city $45,001.02 ($15,199.00 for 2014 and $29,002.02 for 2015) in gross receipt taxes and $6,877.50 in further business registration fees for July 2015 through June 2016. In May 2016, Letterman paid $12,501 in business registration fees for July 2016 through June 2017. Letterman submitted claims to the city for refunds of these payments. Letterman asserted that its receipts are exempt under section 103(c)(9) "because they are rents earned by subletting real property leased from the Presidio Trust." The city denied the claims.

In February 2017, Letterman filed the operative complaint against the city for refunds of the taxes and fees it paid in the amount of $76,880.52, plus interest from the date of payment. The complaint attached copies of the claims for refund and the city's denial of the claims. Letterman asserted three causes of action based on alleged violations of the due process and commerce clauses of the United States Constitution and the Presidio Trust Act. As alleged, the trust leased property in the Presidio to Letterman, which in turn subleased the property to third parties, such as financial services businesses, investment firms, software firms, and nonprofit entities. Letterman earns rent from subleasing the property. With respect to its third cause of action for violation of the Presidio Trust Act, Letterman alleged that

5

"[t]axing [its] receipts earned by subletting real property pursuant to the written lease with, and authorization to do business by, the Presidio Trust is taxing an interest created under a lease of property of the Presidio . . . , in violation of the Presidio Trust Act."

4. *The City's Demurrer and the Trial Court's Ruling*

The city filed a demurrer asserting that Letterman failed to allege facts sufficient to state each cause of action. As relevant here, the city argued, and continues to maintain, that Letterman's third cause of action for violation of section 103(c)(9) fails because "[a] tax on gross receipts does not become a tax on an 'interest' created under a lease simply because [Letterman] earns its money from rental payments." The city claims that an "interest created under leases . . . associated with the properties," as used in section 103(c)(9), refers to possessory interests, not the privilege of engaging in a business or the right to receive rent from sublessees of the property it leases from the trust. It contends further that Letterman's interpretation of section 103(c)(9) as a prohibition on the taxation of its rental income conflicts with the Buck Act.

Letterman opposed the demurrer, arguing that the phrase "all interest created under leases . . . associated with the properties" in section 103(c)(9) includes the right to receive rent from subleases of the leased property. Since the exemption is from "all taxation and special assessments of every kind," Letterman claims its receipts are exempt from the city's gross receipts tax and business registration fee. Letterman argues, "there is no reason to assume Congress would not have overridden the Buck Act" and "[a]s the more recent and specific provision, the Presidio Trust Act would control."

The trial court overruled the city's demurrer as to the first cause of action and sustained it as to the second and third causes of action without leave to amend. With respect to the third cause of action, the court concluded

6

that "San Francisco's gross receipts tax and business registration fee do not constitute taxation of [Letterman's] 'interest' created under a lease. (See, e.g., *US. v. Wells Farg Bank* (1988) 485 U.S. 351, 355; *Northern Commercial Co* v. *Territory of Alaska* (9th Cir. 1923) 289 F. 786, 787; *Brunton* v. *Superior Court of Los Angeles County* (1942) 20 Cal.2d 202, 207; *Tin Tin Corp.* v. *Pacific Rim Park, LLC* (2009) 170 Cal.App.4th 1220, 1228; *City and County of San Francisco. v. Flying Dutchman Park, Inc.* (2004) 122 Cal.App.4th 74, 78; *City of Berkeley* v. *Cukierman* (1993) 14 Cal.App.4th 1331, 1336, fn. 2, 1340-1341.) Because the Buck Act permits taxes measured by gross receipts, [Letterman's] construction of Section 103(c)(9) of the Presidio Trust Act treats it as an implied repeal of the Act. The Court disagrees that Congress intended to repeal the Buck Act as to the Presidio when it enacted the Presidio Trust Act. The original language of Section 103(c)(9) prohibited the taxation of the Presidio Trust or any property administered by the Trust. (P.L. 104-333, 110 Stat. 4100, November 12, 1996, § 103(c)(9).) This language was consistent with, not contrary to, the Buck Act, because the Buck Act did not permit the taxation of any instrumentality of the United States (4 U.S.C. § 107) or authorize the collection of property taxes *(id.* §§ 105, 106); moreover, the amended language on which [Letterman] relies was added as part of what were described as 'technical or clarifying' amendments. (145 Cong. Rec. 815146-02, § 15146, 1999 WL 1050489; 146 Cong. Rec. H409-02, H409, 2000 WL 158365.)"

The parties stipulated to dismissal of the first and second causes of action, judgment was entered for the city, and this timely appeal by Letterman followed.

## DISCUSSION

1. *Standard of Review*

" ' "On appeal from an order of dismissal after an order sustaining a demurrer, our standard of review is de novo." ' " (*Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 650.) In reviewing the complaint, "we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable." (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814.) Where the issue of substantive law presents a question of statutory interpretation, our review likewise is de novo. (See *People v. Arroyo* (2016) 62 Cal.4th 589, 593.)

2. *Section 103(c)(9) exempts a lessee of property in the Presidio only from the payment of property taxes.*

The parties agree that the lease from the Presidio Trust to Letterman, and the subleases from Letterman to its tenants, create possessory interests that section 103(c)(9) exempts from the payment of property taxes. Letterman contends that the exemption from the payment of state and local taxes on "all interest" under the leases extends as well to the "interest" in collecting rent. We agree with the city that this argument is largely a play on words. The term "interest" as used in section 103(c)(9) refers to property, or possessory, interests, and not to the rights that the property interest conveys. The statute exempts Letterman and its sublessees from the payment of property taxes but not from payment of taxes levied on gross receipts from use of the property. This is so despite the fact that it is the lease that creates the right to sublet and collect the rents.

The distinction between a property tax and an excise or gross receipts tax is well recognized under both federal and state law. In *United States v. Wells Fargo Bank (*1988) 485 U.S. 351, the United States Supreme Court held

that an exemption from the payment of "all taxation now or hereafter imposed by the United States" did not exempt certain promissory notes from the payment of estate taxes. The court explained, "an exemption of property from all taxation ha[s] an understood meaning: the property was exempt from direct taxation, but certain privileges of ownership, such as the right to transfer the property, could be taxed. Underlying this doctrine is the distinction between an excise tax, which is levied upon the use or transfer of property even though it might be measured by the property's value, and a tax levied upon the property itself. The former has historically been permitted even where the latter has been constitutionally or statutorily forbidden." (*Id.* at p. 355.)

This basic distinction between the taxation of property and taxation of the right to earn income derived from a possessory interest in the property, or an excise tax, has been recognized and enforced in the numerous federal and state cases cited by the trial court. (*Northern Commercial Co* v. *Territory of Alaska, supra,* 289 F. at p. 787 ["Property taxes are taxes assessed on all property of a certain class in proportion to its value on a specified date. It is assessed at a stated period and collected at an appointed time. An excise tax, as the term itself indicates, is a sum cut out of that which is received or enjoyed by the person subjected thereto. It includes every tax imposed upon the privilege of performing an act or engaging in a business or occupation."]; *Brunton* v. *Superior Court of Los Angeles County, supra,* 20 Cal.2d at pp. 206-207 [license fee for operation of oil well "is not a tax upon the value of the property . . . but a tax upon the privilege of drilling for oil. It is settled that a privilege tax is not a property tax within the meaning of this and other sections of the Constitution"]; *Tin Tin Corp.* v. *Pacific Rim Park, LLC, supra,* 170 Cal.App.4th at p. 1229 [distinguishing

9

between "assessments against *real property* interests" and "the privilege of doing business [citation] or the income generated by the conduct of the business"]; *City and County of San Francisco. v. Flying Dutchman Park, Inc., supra,* 122 Cal.App.4th at p. 88 ["[A]n important distinction is made between the taxation of real estate ownership on an ad valorem basis, and a tax on the *use* of that real property. It has long been recognized that a tax on the separate use of the property, known as an excise tax, is permissible, and does not constitute double taxation."]; *City of Berkeley* v. *Cukierman, supra,* 14 Cal.App.4th at p. 1341 ["property tax and excise tax can be imposed simultaneously"].)

Thus, the State Board of Equalization has recognized that section 103(c)(9) prohibits the taxation of possessory interests in the Presidio, with no suggestion that the exemption applies to any other taxes payable by Presidio tenants. (SBE Property Tax Annot., 660.0092, Jan. 30, 2002.) The board's opinion summarizes: "(i) the Presidio property was ceded to the federal government for military purposes prior to 1939, (ii) the Presidio property is no longer used for military purposes, and (iii) not only has Congress not consented to state and local assessment of privately held possessory interests in Presidio property, but it has enacted legislation specifically precluding the assessment and taxation of such interests. As a consequence, such privately held possessory interests in Presidio real property are exempt from state and local property taxation."[6]

Letterman argues that the 2000 amendment to section 103(c)(9), adding the phrase "and all interest created under leases, concessions, permits

---

[6] State Board of Equalization annotations "are ' "not controlling upon the courts," ' but do ' "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." ' " (*Dyanlyn Two v. County of Orange* (2015) 234 Cal.App.4th 800, 811.)

10

and other agreements associated with the properties," would be superfluous if not construed to refer to more than possessory interests that were exempted from taxation before the amendment was added. Not so. As explained above, section 103(c)(9) was enacted to exempt from taxation privately held interests in property owned by the federal government. (See, *ante,* p. 3 & fn. 4.) Read literally, however, the property tax exemption for "all properties administered by the Trust" might not be read to apply to Letterman's possessory interest in the property or to the possessory interests of its subtenants. The 2000 amendment clarified that their interests in the property were included in the exemption.

While it may be unnecessary to rely on the legislative history to interpret the plain meaning of the statute, that history does confirm that the 2000 amendment was not intended to override the Buck Act or to create additional tax exemptions. The amendment was among "a number of technical and clarifying amendments" included in the "Omnibus Parks Technical Corrections Act of 2000," in title I thereof, entitled "Technical Corrections to Division I." (Pub.L No. 106-176 (Mar. 10, 2000) 114 Stat. 23.) As explained by Congressman Hansen when the bill amendments were discussed in the House of Representatives, the bill in which the amendment is included "is a noncontroversial bill that makes a number of technical corrections to the Omnibus Parks and Public Lands Management Act of 1966 and to other laws related to parks and public land management."[7] (145 Cong. Rec. S15146-02, S151465; 146 Cong. Rec. H409, H409.)

---

[7] The amendment to section 103(c)(9) was twelfth of thirteen technical clarifications to the title and division in which the Presidio Trust Act appears. As examples of the nature of the clarifications made by the bill, the changes immediately preceding and following the amendment to

11

It may be true, as Letterman argues, that relieving tenants of the obligation to pay local income taxes might eventually and indirectly permit the Presidio trust to increase the rent charged to its tenants, thus advancing the objective of self-sustainability of the Presidio. But there is not a word anywhere in the legislative history to suggest that the 2000 amendment was designed to advance that objective. There is not even a hint that the amendment was intended to expand the exemption from the taxation of property interests to "interests" of another kind, such as the right to do business, to sublease the property, or to receive rent or other income from use of the property. Legislative history aside, tax exemptions are to be construed narrowly. (*Bingler v. Johnson* (1969) 394 U.S. 741, 752; see also *Alpha Therapeutic Corp. v. County of Los Angeles* (1986) 179 Cal.App.3d 265, 270 ["exemptions are to be narrowly construed" and "doubt about the applicability

___

section 103(c)(9) were the following: "(11) Section 103(c)(2) (110 Stat. 4099) is amended by striking 'consecutive terms' and inserting 'consecutive terms, except that upon the expiration of his or her term, an appointed member may continue to serve until his or her successor has been appointed'. [¶] (12) . . . [¶] (13) Section 104(d) (110 Stat. 4102) is amended as follows– [¶] by inserting '(1)' after 'FINANCIAL AUTHORITIES.'–; [¶] by striking '(1) The authority' and inserting '(A) The authority'; [¶] by striking '(A) the terms' and inserting '(i) the terms'; [¶] by striking '(B) adequate' and inserting '(ii) adequate'; [¶] by striking '(C) such guarantees' and inserting '(iii) such guarantees'; [¶] by striking '(2) The authority' and inserting '(B) The authority'; [¶] by redesignating paragraphs (3) and (4) as paragraphs (2) and (3) respectively; [¶] in paragraph (2) (as redesignated by this section)– [¶] by striking 'The authority' and inserting 'The Trust shall also have the authority'; [¶] by striking 'after determining that the projects to be funded from the proceeds thereof are creditworthy and that a repayment schedule is established and only'; and [¶] by inserting after 'and subject to such terms and conditions,' the following 'including a review of the creditworthiness of the loan and establishment of a repayment schedule,'; and [¶] in paragraph (3) (as redesignated by this section) by inserting before 'this subsection' the following 'paragraph (2) of.' "

12

of an exemption is resolved against that exemption"].) An expansion of the exemption as Letterman urges would negate the provisions of the Buck Act, which authorizes the imposition of state and local taxes on gross receipts earned by private parties in the federal enclave. Such an implicit repeal of other legislation is not countenanced. (See *Epic Systems Corp. v. Lewis* (2018) 138 S.Ct. 1612, 1617 ["There is a 'stron[g] presum[ption]' that disfavors repeals by implication and that 'Congress will specifically address' preexisting law before suspending the law's normal operations in a later statute."]; *Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1005 ["Implied repeals may be found only where ' "there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are '. . . so inconsistent that the two cannot have concurrent operation.' " ' "].) An exemption of a tax liability will not be implied. (*United States v. Wells Fargo Bank, supra,* 485 U.S. at p. 354 [noting "the settled principle that exemptions from taxation are not to be implied; they must be unambiguously proved"].)

Moreover, were section 103(c)(9) read to exempt a lessee of Presidio property from payment of the city's gross receipt tax and business registration fee, the provision unquestionably would conflict with the provisions of the Buck Act. There would be no occasion to consider the principles applicable to the resolution of conflicting statutory provisions, however, because the antecedent principle is that the statutes should be interpreted to avoid the conflict if reasonable to do so. (*Morton v. Mancari* (1974) 417 U.S. 535, 551 [" 'When there are two acts upon the same subject, the rule is to give effect to both if possible.' "]; *Fair v.Bakhtiari* (2006) 40 Cal.4th 189, 199 [related statutes are construed "so as to harmonize their requirements and avoid anomaly"].) There is no conflict between

section 103(c)(9) and the Buck Act if section 103(c)(9) is construed in the common-sense manner of exempting the holders of possessory interests in the Presidio only from payment of a property tax.

The cases cited by Letterman in support of its interpretation of the word "interest" as it is used in section 103(c)(9) are singularly inapposite. *Russello v. United States* (1983) 464 U.S. 16, 17, interpreted the phrase "any interest [the defendant] has acquired . . . in violation of [18 U.S.C.] section 1962" for the purpose of applying the forfeiture provision of the Racketeer Influenced and Corrupt Organizations (RICO) chapter of the Organized Crime Control Act of 1970 (18 U.S.C. § 1961 et seq.). The issue in the case was "whether profits and proceeds derived from racketeering constitute an 'interest' within the meaning of this statute and are therefore subject to forfeiture." (464 U.S. at p. 20.) *Cook v. City of Buena Park* (2005) 126 Cal.App.4th 1, 6, questioned whether a landlord had a "protected life, liberty, or property interest" for the purpose of asserting a due process claim against application of a statute requiting him to undertake eviction proceedings against a tenant. *DFS Group L.P. v. County of San Mateo* (2019) 31 Cal.App.5th 1059, 1088, questioned whether the exclusive right to sell merchandise at duty-free shops in San Francisco Airport may be considered in determining the value of its possessory interest in its airport locations for property tax purposes (and held that it may not). *County of Los Angeles v. County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102, 112, considered a similar question (and reached a similar conclusion) with respect to car-rental companies at several Los Angeles area airports. *Watson Cogeneration Co. v. County of Los Angeles* (2002) 98 Cal.App.4th 1066, 1070, considered whether it was proper to consider the actual income stream resulting from an above-market price government-facilitated power purchase

14

agreement in the property tax valuation of an independent power plant developed and operating under that agreement (and held that it was). *American Sheds, Inc. v. County of Los Angeles* (1998) 66 Cal.App.4th 384, 389, considered whether, in valuing certain landfill property for the purpose of the real property tax, it was proper to include the value of intangibles, including operating permits and 'business enterprise' value (and held that it was).

None of these cases have the slightest bearing on whether an exemption from taxation of specified properties and of "all interest created under leases . . . associated with the properties" can be understood as an exemption from the taxation of gross receipts received from renting the properties. None supports conflating a property interest with the rights conveyed by that interest. Letterman argues that if the Congressional intent had been to limit the 2000 amendment to the exemption of possessory or property interests, "possessory" or "property" would have been inserted before the word "interest." We consider it far more likely that no such word was included simply because it is unnecessary; in context it is apparent that the reference is only to an interest in the property. Moreover, even were the *right* to receive rent considered an "interest" conveyed by the lease, that would not mean that the *rental income,* or gross receipts, is such an interest. In no case cited by Letterman or disclosed by our own research has taxation of rental income ever been held to constitute taxation of an interest under a lease.

Nor do any of the numerous cases cited by Letterman for the proposition that "all" means all shed any light on the question. (E.g., *Lee v. O'Hara* (1967) 57 Cal.2d 476, 478.) Nor does the breadth of an "exempt[ion] from all taxation of every kind," as Letterman points to in *Illinois Central*

*Railroad Co. v. Emerson* (1921) 299 Ill. 328, 334[8] and other cases. The broad language in section 103(c)(9), "shall be exempt from all taxes and special assessments of every kind," confirms, perhaps unnecessarily,[9] that the Presidio trust is exempt from the payment of taxes of every kind. The 2000 amendment clarifies that no tax may be imposed on Presidio property, regardless of who holds the possessory interest in the property. But section 103(c)(9), which begins, "The Trust and all properties administered by the Trust," does not purport to exempt any other party from the payment of an otherwise applicable tax other than a tax on the property itself.

## DISPOSITION

The judgment is affirmed.


POLLAK, P. J.

I CONCUR:

BROWN, J.

---

[8] Ironically, the full provision in the *Illinois Central* case read, "the said corporation is hereby exempted from all taxation of every kind, except as herein provided for" and the operative document there did require other payments to the state.

[9] See *Prime Time International Company v. U.S. Department of Agriculture* (D.C. Cir. 2014) 753 F.3d 1339, 1342 [" '[S]ometimes Congress . . . drafts [statutory] provisions that appear duplicative of others . . . simply, in Macbeth's words, to make assurance double sure.' "]; *United States v. Carona* (9th Cir. 2011) 660 F.3d 360, 369 ["[S]tatutes often contain overlapping provisions. The term 'belt and suspenders' is sometimes used to describe the common tendency of lawyers to use redundant terms to make sure that every possibility is covered."].

STREETER, J., Concurring and Dissenting.

The question we address in this case is whether the federal tax exemption embodied in section 103(c)(9) of the Presidio Trust Act (section 103(c)(9)) extends to rents collected under a sublease authorized by the terms of a lease administered by the Presidio Trust (the Trust) in the City and County of San Francisco (the City).

Letterman's argument that it does centers on the statutory phrase, "all interest created under leases, concessions, permits and other agreements associated with the properties." (§ 103(c)(9).) If we are going to make a serious effort to discern the meaning of those words, I think we must deal with the plain language, rather than importing into it a specialized meaning taken from the field of property taxation that we think Congress must have had in mind when enacting the statute in 1996.

Without considering whether, based on the actual language Congress used, there is any ambiguity which justifies looking beyond the plain text, the majority inserts the word "possessory" as a modifier to "interest"—apparently because in the field of property taxation law there is a well understood distinction between direct taxation on possessory interests in property and excise taxes on income produced from such interests—and on that premise then proceeds to conclude that the exemption at issue here does not apply.

Of course it is right that the section 103(c)(9) exemption extends to nothing more than possessory interests in property if we assume that conclusion going in. I prefer an approach that first makes an effort to discern congressional intent from the actual language of the statute, read in light of the entire statutory scheme, and only then, if the issue presented cannot be resolved on that basis, resorting to other tools of interpretation.

1

And if we must look beyond the plain words of the statute, I would infer from the legislative history—specifically, the addition of clarifying language by amendment in 2000—an intent to ensure that the exemption in section 103(c)(9) covers the full breadth of the commercial leasing business the Trust is in, including subleasing and anything else with a contractual nexus to its properties. Giving the operative language that construction best effectuates the congressional intent, evident from the language of the statute, to support the Trust's ability to operate the Presidio in a self-sustaining way.

## I. BACKGROUND

Because the Trust itself is a government-owned corporation, it is exempt from all taxation, state and federal. And because the Presidio, as a place, is a federal enclave, all property comprising the Presidio and all income-producing activities within it are exempt from state and local taxes. Not just property taxes. Any taxes.

In the Buck Act, Congress removed some of this exemption, but not all of it. Under the Buck Act, which is not specific to the Presidio but opens federal enclaves to taxation nationwide, states and local jurisdictions may impose income taxes on activities in federal areas, or on residents of such federal areas, to the same extent and with the same effect as though such land was not a federal area. (4 U.S.C. § 106(a).)

At issue here are two forms of local taxation. Under article 12-A-1, section 953, subdivision (a) of the San Francisco Business and Tax Regulations Code, "every person engaging in business within the City shall pay an annual gross receipts tax." The City characterizes the tax as "a privilege tax imposed upon persons engaging in business within the City for the privilege of engaging in a business or occupation in the City." (*Id.*, subd. (b).) In addition, the City requires that such businesses pay an annual

2

registration fee, which is measured by its gross receipts.  (S.F. Bus. & Tax Regs. Code, art. 12, § 855, subd. (e)(1).)

Letterman claims that the section 103(c)(9) exemption insulates its sublease income from the gross receipts tax, and that, as a business, it also enjoys an exemption from the annual registration fee under section 103(c)(9). I think Letterman is right about sublease income, but wrong about the annual registration fee.  Thus, as explained further below, I concur with the result reached by the majority with respect to the annual registration fee, but I respectfully dissent from the majority's view that Letterman's sublease income is subject to the gross receipts tax.

## II. ANALYSIS

### A. *Interpretive Principles*

"Well-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.  [Citation.]  We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent."  (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715; see *Robinson v. Shell Oil Co.* (1997) 519 U.S. 337, 340.)  "When statutory language is clear and unambiguous, ' "there is no need for construction and courts should not indulge it." ' "  (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268; see *Robinson v. Shell Oil Co., supra*, 519 U.S. at p. 340.)

Where, as here, a statute contains a tax exemption, we apply the settled principle that exemptions from taxation are to be narrowly or strictly construed in favor of the state.  (*Alpha Therapeutic Corp. v. County of Los Angeles* (1986) 179 Cal.App.3d 265, 270; *Helvering v. Northwest Steel Rolling Mills* (1940) 311 U.S. 46, 49.)  But this "rule of strict construction

3

does not require that the narrowest possible meaning be given to the exempting language, for a fair and reasonable interpretation must be made of all laws with due regard for the ordinary acceptance of the language employed and the object sought to be accomplished. . . . [S]trict construction must still be a reasonable construction." (*English v. County of Alameda* (1977) 70 Cal.App.3d 226, 234, italics omitted.)

## B. *Statutory Text and Structure*

Section 103(c)(9) reads: "Taxes. The Trust and all properties administered by the Trust and all interest created under leases, concessions, permits and other agreements associated with the properties shall be exempt from all taxes and special assessments of every kind by the State of California, and its political subdivisions, including the City and County of San Francisco."

Also relevant is the structure of the statute, since the specific provision at issue, and its language, must be read contextually, together with the statutory scheme as a whole. (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1107.)

Congress intended that through the Trust, the Presidio is to be "managed through an innovative public/private partnership that minimizes cost to the United States Treasury and makes efficient use of private sector resources." (§ 101(7).) With the goal of making the Presidio as close to financially self-sustaining as possible, Congress established the Trust so that, as an operating entity, it could generate income that would be reinvested in the operation and maintenance of the grounds and historical structures. (See § 101(5) & (7).)

4

The Presidio is unique within the National Park System in that unlike other parks, it is required to "increase revenues to the Federal Government to the maximum extent possible." (§ 104(c).) Toward that end, the Trust has authority to enter into leases and other arrangements "as are necessary and appropriate to carry out its authorized activities." (§ 104(b).) And "[i]n managing and leasing the properties transferred to it, the Trust shall consider the extent to which prospective tenants contribute to the implementation of the general objectives of the General Management Plan for the Presidio and to the reduction of cost to the Federal Government. The Trust shall give priority to the following categories of tenants: Tenants that enhance the financial viability of the Presidio and tenants that facilitate the cost-effective preservation of historic buildings through their reuse of such buildings." (§ 104(n).)

As these provisions indicate, Congress created a singular form of land management to accommodate the unique needs of the Presidio. It specifically envisioned that the use of building leases would be instrumental to the Trust's goals. Lease revenues would provide the Trust with a stable income stream required for its financial self-sufficiency. Leases also ensure that vacant Presidio spaces are occupied or rehabilitated. Given the Trust's priority of "increasing revenues . . . to the maximum extent possible" and its reliance on lease revenues to achieve that, construing section 103(c)(9)'s tax exemption as extending to interests created under such leases can be squared with the Presidio Trust Act's purposes.

Congress understood that the Trust would operate as a commercial enterprise, and that commercial leasing would be among its sources of revenue. Thus, the Trust was granted power to "negotiate and enter into such agreements, leases, contracts and other arrangements with any person,

5

firm, association, organization [or] corporation" as it saw fit. (§ 104(b).) And in operating its leasing businesses, the Trust was charged to "give priority to . . . [t]enants that enhance the financial viability of the Presidio . . . ." (§ 104(n).)

Because every dollar in sublease income not subject to tax by the City enhances the total leasing revenue the Trust will be able to generate from administering the Presidio properties, I think section 103(c)(9) must be construed in light of Congress's evident purpose—maximizing the operating income of the Trust so that it can operate the Presidio as a self-sustaining enterprise. And I think that construction must center on the plain language of the exemption at issue: "all interest created under leases, concessions, permits and other agreements associated with the properties," a phrase section 103(c)(9) does not define. Where terms are undefined, "[t]he everyday understanding . . . should count for a lot," and we look to "regular usage to see what Congress probably meant." (*Lopez v. Gonzales* (2006) 549 U.S. 47, 53; *Sacks v. City of Oakland* (2010) 190 Cal.App.4th 1070, 1082.)

### 1. "all interest"

Moving to the first step of the textual analysis here, I note that the parties do not dispute the meaning of "all" in the phrase "all interest." Because the phrase is not a term of art, its meaning may be discerned as a matter of everyday English. "All" is defined as "the whole amount, quantity, or extent of" and "every member or individual component of." (Merriam-Webster.com <https://www.merriam-webster.com/dictionary/all> [as of Dec. 30, 2020].) It cannot be disputed that the word "all" has an expansive meaning. (See *Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 433–434 ["The dictionary is a proper source to determine the usual and ordinary meaning of words in a statute"

6

and "relevant dictionary definitions are those extant before or at least near in time to the statutory or contractual usage"].)

Some dictionaries do, as Letterman says, define an "interest" as a "right, title, or legal share in something" (Merriam-Webster.com <https://www.merriam-webster.com/dictionary/interest> [as of Dec. 30, 2020]), or a "legal share in something; all or part of a legal or equitable claim to or right in property <right, title, and interest>" (Black's Law Dict. (11th ed. 2019) p. 968, col. 1).  But the phrase "all interest" in section 103(c)(9) precedes the phrase "created under leases, concessions, permits and other agreements," which suggests that "interest" should be understood in light of the words that follow.  (See *People v. Valencia* (2017) 3 Cal.5th 347, 362 [specific location of words within a statute may serve as an indicator of their meaning and scope].)  Thus, to further illuminate the context in which the words are used, we must look to the adjacent phrase, "created under leases," in section 103(c)(9).

**2.  "created under leases"**

"Create" means "to bring into existence" or "to produce or bring about by a course of action or behavior."  (Merriam-Webster.com <https://www.merriam-webster.com/dictionary/create> [as of Dec. 30, 2020].)  "Under" means "[s]ubject to the authority, control, guidance, or instruction of," as in "under a contract."  (Merriam-Webster Dictionary.com <https://www.merriam-webster.com/dictionary/under> [as of Dec. 30, 2020]).

The meaning of "lease" is well settled.  A lease is "a contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, usu[ally] rent."  (Black's Law Dict. (11th ed. 2019) p. 1066, col. 2.)  Cases also define "lease" in terms of what right or interest the lease "creates."  For example, as explained in *Winters*

*Coal, Inc. v. Commissioner of Internal Revenue* (1974) 496 F.2d 995, 998 (plur. opn. of Coleman, J.), "[t]here is little conflict or disagreement with the old hornbook principle that a lease is a conveyance and creates in the lessee an estate which entitles him to exclusive possession unless certain rights are reserved by the lessor."[1]  It is also commonly understood that a "sublease" is a form of lease, specifically one "by a lessee to a third party, transferring the right to possession to some or all of the leased property for a term shorter than that of the lessee, who retains a right of reversion."  (Black's Law Dict. (11th ed. 2019) p. 1724, col. 1.*)*  That is so because "the relation created by a sublease [is] for all general purposes the ordinary relation of landlord and tenant." (*Marcellus v. K.O.V., Inc.* (1980) 5 Kan.App.2d 339, 341; see also 52 C.J.S. Landlord (2020) Landlord & Tenant, § 338 ["The word 'lessee' has been construed as including a sublessee"].)

To this point in the textual analysis, there is no real dispute.  Both parties accept that an "interest created under [a] lease[]" or sublease is the possession of property in a lessee or sublessee, and that ultimately the sublease at issue here is an "agreement[] associated with" "properties administered by" the Trust.  Letterman alleges that it leased real property from the Trust and in turn subleased that property to other parties.  The parties thus agree that the lease and sublease created possessory interests and that such interests are exempt from taxation under section 103(c)(9).  Where the parties diverge is on whether, as Letterman urges,

---

[1] See *California State Teachers' Retirement System v. County of Los Angeles* (2013) 216 Cal.App.4th 41, 55 ("in the creation of a lease, the fee simple interest is divided into the leasehold interest [i.e., the possessory interest] and the leased fee interest [i.e., the nonpossessory interest]"); see also *Herpel v. County of Riverside* (2020) 45 Cal.App.5th 96, 107 ("when an exempt or immune entity leases its property, '[i]t creates valuable privately-held possessory interests' ").

section 103(c)(9) also exempts from taxation Letterman's receipts of the rent it earns from its subleases, or, as the City urges—and the majority agrees— section 103(c)(9) only "refers to taxes levied against property or possessory interests in that property." I find Letterman's position on this critical issue to be more persuasive.

As noted above, a lease is "a contract by which a rightful possessor of real property conveys the right to use and occupy the property *in exchange for consideration, usu[ally] rent.*" (Black's Law Dict. (11th ed. 2019) p. 1066, col. 2, italics added; see *Seminole Tribe of Florida v. Stranburg* (11th Cir. 2015) 799 F.3d 1324, 1331 [rent payments "secure a lessee's possessory interest in the land for the duration of the lease" (italics omitted)].) Courts have held that the "right to . . . rent is not a separate and distinct item of property but is part of the bundle of rights incident to the ownership of the fee [simple]." (*Koch v. Commissioner of Internal Revenue* (1978) 71 T.C. 54, 66; see *Sullivan v. United States* (3d Cir. 1980) 618 F.2d 1001, 1005 [same]; *Ellingson v. Walsh, O'Connor & Barneson* (1940) 15 Cal.2d 673, 675 [tenancies in property "carry with them the incident obligation of rent"]; *Seminole Tribe of Florida v. Stranburg*, *supra*, 799 F.3d at p. 1331 ["payment [of rent] under a lease is intimately and indistinguishably connected to the leasing of the land itself"].)

Indeed, the covenant to pay rent runs with the land; until separated from the reversion, rent constitutes a part of the land and passes as an incident to a transfer of the reversion. (See *Callahan v. Martin* (1935) 3 Cal.2d 110, 124 ["the right to receive future rents . . . is an incorporeal hereditament, an interest in land"]; accord, *People ex rel. Hargrave v. Phillips* (1946) 394 Ill. 119, 123 [" 'Unaccrued rents . . . are an incident to the reversion and follow the land . . . . [A]lthough separable from the reversion,

9

[they] are, until such separation, part of the land' "].)  Accordingly, a "lessor's interest" is defined as "[t]he present value of the future income under a lease, plus the present value of the property after the lease expires."  (Black's Law Dict. (11th ed. 2019) p. 1086, col. 1; accord, *Cherokee Water Co. v. Gregg County Appraisal Dist.* (1990) 801 S.W.2d 872, 875 ["The lessor's interests in the property are not just the future right to receive the property back at the end of term, but the present right to receive income in the form of rent"].)

### 3.  "all taxes"

Reading all of the operative words in section 103(c)(9) as a whole, I would conclude that, by its plain text, the statute exempts from "all taxes" Letterman's receipt of sublease rent payments, since these rents were produced by a legal right or claim (an "interest[]") that was, in turn, brought into existence ("created under leases") by a sublease under a lease with the Trust ("associated with properties administered by the Trust").

Because we must presume that Congress legislated with knowledge that the unadorned phrase "created under leases," as used in this context, would sweep within it not only any possessory interest under but rents produced by such leases (see *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 675 ["When the Legislature enacts language that has received definitive judicial construction, we presume that the Legislature was aware of the relevant judicial decisions and intended to adopt that construction"]), the statutory language should be read with commensurate breadth.  In my view, we must take Congress at its word when it used the phrase "all taxes" in section 103(c)(9).  (*County of Oakland v. Federal Housing Finance Agency* (6th Cir. 2013) 716 F.3d 935, 940 ["a straightforward reading of the statute leads to the unremarkable conclusion that when Congress said 'all taxation,'

10

it meant all taxation"]; *Sander v. Alexander Richardson Inv.* (8th Cir. 2003) 334 F.3d 712, 716 [" 'In short, "all" means all' "].)

The City blithely dismisses any need to deal directly with statutory text, describing Letterman's interpretation of the phrases "all interest" and "created under leases," when read together with "all taxes," as "little more than wordplay." But disparagement of an opposing interpretation of statutory text does not substitute for engagement with it. (*Estate of Dye* (2001) 92 Cal.App.4th 966, 976 ["A party attacking a meaning succeeds only if the attacker can propose an alternative, plausible, candidate of meaning"].) By offering no textual analysis of its own, the City pays no heed to the fundamental rule that we must "first examine the [statutory] words themselves [as they are] . . . generally the most reliable indicator of legislative intent." (*Hassan v. Mercy American River Hospital, supra,* 31 Cal.4th at p. 715.) It is here, I think, that the majority goes astray in adopting the City's analysis, glibness and all.

As a substitute for its own analysis of the text, the City invokes the principle that tax exemption statutes are to be construed narrowly. But that rule presupposes an available plain language reading of the exemption to support invocation of the narrow construction principle. (See *English v. County of Alameda, supra,* 70 Cal.App.3d at p. 234 ["statutes granting exemption from taxation as a general rule are strictly construed to the end that such concession will neither be enlarged nor extended beyond the plain meaning of the language employed"].) The City does not even pretend there is a plain language reading of section 103(c)(9) to support its position here. Only by presupposing that Congress smuggled into the statute a specialized meaning that is not apparent from the statutory text—which is what insertion of the word "possessory" as a modifier to "interest" accomplishes—

11

does the City's position make sense.  Without this first interpretive step, the City cannot proceed to the heart of its analysis, which is the distinction between property tax and excise tax.

## C. *The Property Tax Versus Excise Tax Distinction*

Rather than deal directly with the statutory text, the City, arguing at a broad, conceptual level, contends that the challenged taxes are excise taxes, not property taxes, and that "Letterman failed to establish that the challenged taxes are imposed on its 'interest' under its subleases."  I find this line of argument unconvincing.  It is untethered to any specific language in section 103(c)(9) and proceeds on the assumption that when Congress said "all taxes" in the statute, it did not really mean *all* taxes.  Unless we are to be guided by an unexpressed policy preference favoring maximum revenue generation for the City at the expense of the federal government, I see no principled foundation for such a limitation.

The majority's citation to *United States v. Wells Fargo* (1988) 485 U.S. 351 (*Wells Fargo*) does not compel a different conclusion. At issue in *Wells Fargo* was an Internal Revenue Service refund claim in a case where the trustee of two family estates, in the mid-1980's, held significant amounts of tax-free housing bonds, known as "Project Notes," in their asset portfolios. (*Wells Fargo*, *supra*, 485 U.S. at pp. 353–354.)  The trustee sought refunds under section 5(e) of the Federal Housing Act of 1937 (section 5(e)), the statute that authorized the issuance of the Project Notes. (*Wells Fargo,* at p. 355.)  The opinion in *Wells Fargo* opens with a careful delineation of the context:  In making the Project Notes tax exempt, the court explained, the congressional purpose was to attract capital as a way of stimulating housing investment in the midst of the Great Depression.  (*Id*. at p. 353.)  "For almost 50 years after the Act's passage," the court points out, "it was generally

12

assumed that [section 5(e)] . . . exempted the [Project] Notes from federal income tax, but not from federal estate tax." (*Ibid*.)

The case arrived in the Supreme Court when, in 1986, the trustee persuaded a district court to adopt the view, never before suggested by any taxpayer in more than five decades, that section 5(e) extended to estate tax as well as income tax. (*Wells Fargo*, *supra*, 485 U.S. at pp. 353–354.) The question in the case was whether, all those years after enactment of section 5(e), the operative statutory term that created the exemption—the phrase "all taxation"—should be read as a perpetual exemption from all forms of tax for all time, not just from income tax but from estate tax as well. Defending the district court's ruling allowing the claimed estate tax refunds, the trustee relied principally on another, long-since repealed provision of the Federal Housing Act of 1937 in which Congress had empowered the Federal Housing Authority to issue bonds in the 1930's that were exempt from income taxes subject to an express carveout ensuring that the exemption would not extend to federal estate and gift taxes. (*Wells Fargo*, at p. 356.) Based on the principle of *expressio unius est exclusio alterius*, the trustee argued that, given the absence of such carveout, section 5(e) should be read to include an implied exemption from federal estate tax. (*Wells Fargo*, at p. 356.)

The *Wells Fargo* court rejected the argument, pointing out that "exemptions from taxation are not to be implied; they must be unambiguously proved." (*Wells Fargo*, *supra*, 485 U.S. at p. 354.) The court explained that "an exemption *of property* from all taxation had an understood meaning: *the property* was exempt from *direct* taxation, but certain privileges of ownership, such as the right to transfer the *property*, could be taxed." (*Id*. at p. 355, italics added.) The court thus concluded that the Project Notes were not exempt from federal estate taxes because estate taxes

13

were excise taxes, "levied upon the use or transfer of property . . . ." (*Ibid.*) That is the core of the reasoning in *Wells Fargo*, and it has no application in this case for the simple reason that the estate tax at issue never purported to tax the Project Notes. The tax there—a form of excise tax—was on the transfer of property, not on the Project Notes themselves.[2] This principle of property taxation has nothing to do with the scenario we have here because neither the City's gross receipts tax nor its annual business registration fee is a tax on property or the transfer of property.

The majority's unstated premise in applying the holding of *Wells Fargo* is that we are dealing with an exemption from a tax on property. But only by impliedly reading the word "possessory" into the statutory text, as the City urges, is it possible to support this premise. As noted above, there is nothing in the statutory language to suggest the key phrase "all interest" is a term of art that demands such a specialized reading. Quite to the contrary, the cluster of words we are focused on here—"*all properties* administered by the Trust *and all interest created under* leases, concessions, permits and other

---

[2] As explained in *Hertel v. Bank of America N.A.* (W.D.Mich. 2012) 897 F.Supp.2d 579, 584, "In *Wells Fargo*, 'all taxation' in the housing statute still meant all taxation even after the court's decision. . . . The reason 'all taxation' was still able to retain its meaning is because the estate tax never purported to tax the promissory notes. The estate tax . . . was a tax on the *transfer* of property, not the property itself. And because the statute specified an exemption *only* for the property and not its owner or its transfer, the exemption was never triggered even though it was the owner of the promissory notes who was liable for the tax." "In context," therefore, "it is clear that the [*Wells Fargo*] Court is explicating the meaning of exempting *property* from taxation: an exemption of property from taxation does not block taxes not imposed on the property, and, since excise taxes are not considered to be imposed on the property itself, they are not exempt. This all seems clear enough." (*Montgomery County Commission v. Federal Housing Finance Agency* (M.D. Ala. May 6, 2013, No. 2:12CV885-MHT) 2013 U.S.Dist. Lexis 64211, at pp. *12–*13.)

14

agreements associated with the properties"—is more expansive than the City would have us read it.

Even if the statutory text could plausibly be read as narrowly as the majority construes it, I think it is incorrect to read more into the holding in *Wells Fargo* than that case plainly stands for: The rejection of an attempt by the trustee for two estates to claim a windfall immunity from federal estate tax based on an out-of-context reading of the Federal Housing Act of 1937 that went far beyond the evident congressional purpose in enacting the statute. Not only does section 103(c)(9), by its terms, create a broader exemption than the one at issue in *Wells Fargo*,[3] but the operative language we are dealing with, in my view, is fully consistent with congressional purpose in enacting the Presidio Trust Act.

Which is why, for me, it is crucial to interpret the term "all interest" in light of the statutory scheme as a whole. Other provisions in the Presidio Trust Act make clear that the Trust was expected to be more than a passive landowner, deriving income, as many national parks do, by charging modest user fees, but to operate as an enterprise—leasing buildings, granting concessions, and entering into all kinds of agreements from which it would derive profit from the land—thus allowing it to reinvest in the operation and maintenance of the Presidio and its historical buildings. This is not guesswork. It is evident on the face of the statutory scheme.

---

[3] Cf. *County of Oakland v. Federal Housing Finance Agency*, *supra*, 716 F.3d at p. 943 (distinguishing between exemptions of property like that in *Wells Fargo* and broader statutory exemptions of the entity-defendants in that case); *Hertel v. Bank of America*, *supra*, 897 F.Supp.2d at p. 584 (same); *Montgomery County Com. v. Federal Housing Finance Agency, supra*, 2013 U.S.Dist. Lexis 64211, at p. *13 (same, and observing that the *Wells Fargo* court "did not . . . turn the phrase 'all taxation' into a term of art in all places where those words may be found").

Unconvinced, the majority employs yet another bootstrap argument offered by the City, this one based on an advisory opinion issued by legal staff of the California State Board of Equalization (Board) discussing section 103(c)(9)'s application to privately held *possessory* interests in Presidio property.  (SBE Property Tax Annots., Annot. 600.0092, The Presidio of San Francisco—Possessory Interests (Jan. 30, 2002).)  The Board's advisory opinion, supplied at the request of the City, concludes that "not only has Congress not consented to state and local assessment of privately held possessory interests in Presidio property, but it has enacted legislation specifically precluding the assessment and taxation of such interests.  As a consequence, such privately held possessory interests in real property are exempt from state and local property taxation . . . ."  (*Id.* at p. 1.)

But the Board did not consider non-possessory interests because the City did not ask it to do so.  As a result, while the Board's interpretation of section 103(c)(9) in the narrow context of possessory interests in property is a factor to consider, it is not dispositive here, or even particularly meaningful, because the Board made no attempt to grapple with whether the critical statutory language "all interest created under leases, concessions, permits and other agreements associated with the properties" extends beyond possessory interests in real property.  (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 14–15 ["The deference due an agency interpretation . . . [and] '[t]he weight of such a judgment in a particular case,' . . . 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control' " (italics omitted)].)

The majority also contends that, to read the phrase "all interest" broadly, as I do, "conflat[es] a property interest with the rights conveyed by that interest." (Maj. opn., *ante,* at p. 15.) But this contention tracks the City's argument that the subject taxes are imposed on the "income derived from the use of property," not the property itself, which goes back to the same flawed premise that we are dealing with here only with possessory interests in the real property sense. The right to receive rent is only one stick in the bundle of rights acquired in the creation of a lease or sublease. (See *Koch v. Commissioner of Internal Revenue, supra,* 71 T.C. at p. 66; see also *Cherokee Water Co. v. Gregg County Appraisal Dist., supra,* 801 S.W.2d at p. 875.) Unlike the majority, I find unpersuasive the City's categorical distinction between taxes on property, on the one hand, and taxes on the income or use derived from the property, on the other. As Letterman points out, "[c]alling rent 'income' does not change the fact that it is an interest created under leases or other agreements associated with [the] properties."

In any event, the argument proves too much. By this reasoning, the phrase "all interest created under leases, concessions, permits and other agreements" brings within it a wide variety of intangible (i.e., nonpossessory) interests, since, as Letterman notes, many interests can be created by any of the listed groups of contractual instruments. (See, e.g., *DFS Group L.P. v. County of San Mateo* (2019) 31 Cal.App.5th 1059, 1087 [holder of an exclusive lease and concession in airport terminal for the sale of duty-free merchandise was entitled to property tax refund, as "the right to sell duty-free goods at [the airport]" was an intangible " 'right to do business that is exercised in connection with the use of the real property' at [the airport]"]; *Watson Cogeneration Co. v. County of Los Angeles* (2002) 98 Cal.App.4th 1066, 1070 ["California decisions have held that assets such as . . . airport car rental

17

concessions, ballpark food concessions . . . are intangible rights"]; *County of Los Angeles v. County of Los Angeles Assessment Appeals Board* (1993) 13 Cal.App.4th 102, 112 [Although the assessor was entitled to tax possessory interests created by concessions agreements, "[t]he further rights granted by the agreements, to do business at the airports and their environs, are not possessory interests.  They are intangibles not subject to property (possessory interest) tax"]; *American Sheds, Inc. v. County of Los Angeles* (1998) 66 Cal.App.4th 384, 389 [governmental permits to operate landfill gave rise to intangible rights].)

## D. *Legislative History*

To achieve its desired result, the City would have us not only add a word that is not there ("possessory"), but treat the language "all interest created under leases, concessions, permits and other agreements associated with the properties" as meaningless surplusage.  Apparently recognizing that this position violates the fundamental canon of construction that we must strive to give meaning to all the words in a legislative enactment (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735), the majority, quoting Macbeth, among other authorities, concludes that Congress must have been engaging in a belt-and-suspenders exercise when it amended the Presidio Trust Act in 2000 to add the statutory wording at the heart of this case.  (Maj. opn., *ante*, at pp. 15–16 & fn. 9.)  According to the majority, the words "and all interest created under leases, concessions, permits and other agreements associated with the properties" were added as part of a batch of "technical" corrections. (Maj. opn., *ante*, at p. 11.)

In this view, the "technical" purpose of the amendment was equivalent to adding an underscore or an exclamation point.  But emphasis to what end? Because I think the plain language of the statute is sufficient to resolve the

18

question presented here, I see no need to delve into legislative history. If we are going to go there, however, I think the purpose of Congress's clarifying emphasis when it amended the statute in 2000 is readily apparent. By then, after four years of operation, the Trust had a substantial operating history. It was clear that, as Congress originally contemplated, many types of commercial activities were generating revenue—not just leasing revenue, but "concessions, permits and other agreements associated with the properties"— and to make sure the tax exemption in section 103(c)(9) matched the breadth of business operations on Trust property, additional language was added that draws from counterpart language elsewhere in the statutory scheme. (See § 104(b) ["The Trust shall have the authority to negotiate and enter into such agreements, contracts, leases and other arrangements with any person, firm, association, corporation or governmental entity"].) In other words, the language was added to capture more accurately what the Trust actually does as an enterprise.

As I read the new language added by amendment in 2000, therefore, it did not broaden the scope of the exemption but merely clarified that the exemption should be read congruently with the provisions in the statute defining the operational scope of the Trust, which extends to various kinds of contracts with private parties. The majority disagrees, pointing out that the amendment cannot have been intended to "expand the exemption from the taxation of property interests to 'interests' of another kind, such as the right to do business, to sublease the property, or to receive rent or other income from use of the property" because there is nothing in the legislative history expressly saying so. (Maj. opn., *ante,* at p. 12.) But that is incorrect. There was no need to expand anything—at least there was no such need, unless one begins by reading the term "all interest[s]" in section 103(c)(9) as "all

19

*possessory* interests," thereby assuming the conclusion of the analysis from the beginning, which is what the majority does by adopting the City's position in this case.

### E. *The Buck Act*

As a final point at the end of its analysis, the majority accepts the City's argument that, if Letterman's interpretation of section 103(c)(9) were correct, Letterman's reading of the Presidio Trust Act exemption would conflict with and result in an implied repeal of the Buck Act (4 U.S.C. §§ 105–111). This issue may be resolved quite simply. There is no irreconcilable conflict between Letterman's position here and the Buck Act.

"When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive ' "to give effect to both." ' " (*Epic Systems Corp. v. Lewis* (2018) ___U.S. ___ [138 S.Ct. 1612, 1624].) "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing ' "a clearly expressed congressional intention" ' that such a result should follow." (*Ibid.*) Such intention " 'must be clear and manifest.' " (*Morton v. Mancari* (1974) 417 U.S. 535, 551 (*Morton*).) "[I]n approaching a claimed conflict," we apply the " 'stron[g] presump[tion]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." (*Epic Systems Corp. v. Lewis, supra*, ___U.S. at p. ___ [138 S.Ct. at p. 1624]; *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805.)

Implied repeals may be found " 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the

two cannot have concurrent operation." ' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles, supra,* 55 Cal.4th at p. 805; *Branch v. Smith* (2003) 538 U.S. 254, 273 ["An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter act covers the whole subject of the earlier one and 'is clearly intended as a substitute' "].)

Applying these principles, I think these two statutes are easily harmonized.  While the two statutes overlap, they can be reconciled by treating section 103(c)(9) as an exception to, but not as a replacement of, section 106(a) of the Buck Act.  " 'It is well settled . . . that a general provision is controlled by one that is special, the latter being treated as an exception to the former.  A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates.' " (*San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 577; *Medical Board of California v. Superior Court* (2001) 88 Cal.App.4th 1001, 1005; see also *Morton, supra*, 417 U.S. at pp. 550–551 ["Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment"].)

Here, the Buck Act "is of general application." (*Morton*, *supra*, 417 U.S. at p. 550.)  Section 103(c)(9), on the other hand, "is a specific provision applying to a very specific situation." (*Morton*, at p. 550.)  It applies only to the Trust, its properties, and, with respect to private individuals or entities, "all interest created under leases, concessions, permits and other agreements associated with the properties." (§ 103(c)(9).)  Thus, at most, section 103(c)(9)

21

will serve as a minor exception affecting only a limited set of interests associated with the Presidio properties.

Even within the Presidio, there remains a wide range of private commercial activities that take place on the Presidio, producing income that is not "created under leases, concessions, permits and other agreements associated with [Trust] properties." For example, any law office or accounting office operating out of the Presidio, or the Presidio's most famous tenant, Lucasfilm and its affiliates, must pay the City's gross receipts tax on revenues arising from commercial activities unrelated to Trust properties. All of these private commercial activities remain subject to the City's gross receipts tax. In the end, in my view, it is an indication of how overreaching the City's position is in this case that it would even suggest section 103(c)(9), as construed by Letterman, somehow obliterates the Buck Act. The idea is absurd.

## F. *Annual Business Registration Fee*

The one narrow issue on which I agree with the majority, and there only in result, is that I too think Letterman is not entitled to a refund of the amounts it paid for the City's annual registration fee. Although the amount of the City's annual business registration fee is set by a schedule that varies by the size of a business's gross receipts (S.F. Bus. & Tax Regs. Code, art. 12-A-1, § 953, subd. (b); *id.*, art. 12, § 855, subd. (e)(1)), the fee itself is not imposed on gross receipts, but on the privilege of doing business. To use tax language, therefore, the *incidence* of the tax is on the right to do business within the City, not on business income generated by that activity (in Letterman's case, its sublease income). The difference matters. Because Letterman's right to do business within the City is not an "interest created

22

under leases, concessions, permits and other agreements associated with [Trust] properties," it is not exempt from the City's annual business license fee.

STREETER, J.

Trial court:                    San Francisco County Superior Court

Trial judge:                    Honorable Harold E. Kahn

Counsel for Appellant:          SILVERSTEIN & POMERANTZ
                                Amy Silverstein
                                Robert Petraglia
                                John Ormonde
                                Adam Hooberman

Counsel for Respondents:        Dennis J. Herrera, City Attorney
                                Jeremy M. Goldman, Co-Chief of Appellate
                                Litigation City Hall